In re RALAR DISTRIBUTORS, INC. and Halmar Distributors, Inc., Debtors.

Bankruptcy Nos. 89–40975–JFQ, 89–40976–JFQ.

United States Bankruptcy Court, D. Massachusetts.

Feb. 28, 1994.

**4**

Paul R. Salvage, Bacon & Wilson, P.C., Springfield, MA, for Ralar Distributors, Inc. and Halmar Distributors, Inc.

Christopher W. Parker, McDermott, Will & Emery, Boston, MA, for Official Creditors Committee.

Charles R. Bennett, Jr., Riemer & Braunstein, Boston, MA, for BayBank Middlesex.

Peter J. Stocks, Worcester, MA, U.S. Trustee.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

BayBank has filed a $2,212,168 claim for "superpriority" under section 507(b) of the Bankruptcy Code. BayBank contends that orders of this court deprived it of adequate protection of its security interests in the property of Halmar Distributors, Inc. and its affiliate, Ralar Distributors, Inc. (the "Debtors"). The Debtors object to the claim. Resolution of the controversy involves application of the obscure language of section 507(b) to the elusive concept of adequate protection.

## I. *FACTS*

The Debtors were wholesale distributors of numerous household and hardware items which they sold to retail chains and department stores. At the time of their chapter 11 filings on October 16, 1989, they owed BayBank approximately $10 million, exclusive of their contingent liability on certain guaranties. Of that amount, about $7 million was owed on a revolving loan agreement secured primarily by inventory and receivables and their proceeds, and $3 million was owed on a term note secured primarily by a real estate mortgage.

Shortly after the Debtors' chapter 11 filings, the Debtors and BayBank arrived at an impasse on postpetition financing. As a result, the Debtors moved over BayBank's objection for authorization to use BayBank's cash collateral. In the ensuing months, I held several cash collateral hearings. At the conclusion of each hearing, I permitted use of

cash collateral for a limited period and in a limited amount. The last authorization expired on March 7, 1990. On March 4, 1990, the Debtors and BayBank reached an agreement providing for the turnover of substantially all of BayBank's collateral, which I approved on March 7, 1990.

At none of the hearings did I find Bay-Bank was oversecured. Indeed, I may have found it was undersecured—the parties have not made the record of the hearings available. At the very least, I assumed there was a serious possibility of BayBank being undersecured, and I concentrated on the question of whether the value of that security interest, whatever it was, was declining as the result of the Debtors' continued use of cash collateral. The Debtors were then in a liquidation mode. Although they were selling some inventory in ordinary course, most items were being sold in bulk sales to selected customers. All net proceeds went to Bay-Bank. The Debtors were gradually reducing their work force during this process. They were also attempting to sell their business as a going concern.

I found at the various hearings that the Debtors' efforts caused an enhancement in the value of BayBank's collateral. The inventory was composed of over 10,000 different items. I found the bulk sales prices to selected customers exceeded the liquidation values BayBank would be able to realize from the inventory, even after taking into account operating losses. Without those bulk sales, I concluded, BayBank would have a difficult time realizing upon the inventory because of the inventory's staggering number of items and BayBank's lack of familiarity with the Debtors' customers. I also believed there was a reasonable possibility the Debtors would be able to sell their business as a going concern, and thereby be able to realize a going concern value for both inventory and receivables. I concluded that this possibility brought a further enhancement in collateral value of some small percentage of

the excess of going concern value over liquidation value. I eventually decided not to further extend the use of cash collateral because I concluded that after three months of gradual liquidation it was then likely the Debtors' continuing operating losses would begin to exceed the collateral value enhancement being produced.

BayBank has now sold the remaining inventory and other collateral, and has collected its receivables. It calculates its claim of $2,212,168 by including postfiling interest and legal expenses. Without those items, BayBank would have no deficiency claim. In other words, BayBank has been paid in full on its entire claim as the claim existed on the filing date.

## II. THE REQUIREMENT OF FAILED ADEQUATE PROTECTION UNDER SECTION § 507(b)

Section 507(b) provides:

> If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection. 11 U.S.C. § 507(b) (1988).

Section 507(b) has been called a "prism in the fog." *In re Callister*, 15 B.R. 521, 526 (Bankr.D.Utah 1981). Although there are several ambiguities in the statute, one of which will be dealt with in part IV of this opinion,[1] I first examine the statute's relationship to adequate protection.

---

1. Part IV deals with the meaning of the statute's reference to administrative expense priority under section 507(a)(1). Other ambiguities involve the question of whether section 507(b) provides protection against a stipulated adequate protection order, *compare In re Callister*, 15 B.R. 521

(Bankr.D.Utah 1981) *with In re Becker,* 51 B.R. 975 (Bankr.D.Minn.1985), and whether in the context of the court's dismissal of a motion for § 362 relief a trustee "provides" adequate protection within the meaning of the statute, *see In re Downing & Co.,* 94 B.R. 515 (Bankr.N.D.Ill.

There is scant legislative history on section 507(b). The subsection was in neither the original House or Senate bill. *See* H.R. 8200, 95th Cong., 1st Sess. (1978); S.2266, 95th Cong., 2d Sess. (1978). It first appeared in the compromise bill adopted by the House on September 28, 1978, which was an amendment in the nature of a substitute to the amendments proposed in the Senate bill. Unlike the House bill, the Senate bill did not permit the grant of administrative expense priority as a method of providing adequate protection. *Compare* H.R. 8200, 95th Cong., 1st Sess. (1978) § 361 *with* S.2266, 95th Cong., 2d Sess. (1978) § 361. Section 361(3) as enacted prohibits this method of providing adequate protection.

The following statements were made on the floors of both houses:

> Section 507(b) of the House amendment is new and is derived from the compromise contained in the House amendment with respect to adequate protection under section 361. Subsection (b) provides that to the extent that adequate protection of the interest of a holder of a claim proves to be inadequate, then the creditor's claim is given priority over every other allowable claim entitled to distribution under section 507(a). 124 Cong.Rec. H11,095 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17,411, (daily ed. Oct. 6, 1978).

Section 507(b) is thus intended to grant senior administrative expense priority in order to compensate the holder of a claim "to the extent that adequate protection of the interest of a holder of a claim proves to be inadequate...." *Id.*

## III. PRESENCE OF ADEQUATE PROTECTION IN THIS CASE

BayBank contends the Debtors' use and sale of BayBank's collateral caused its collateral to decrease in value during the period of the hearings by at least $2,212,168, the amount of its present claim. As a result, BayBank says, the court's orders deprived it of adequate protection because the lost collateral value would have otherwise been available to pay its postfiling interest and legal fees pursuant to section 506(b).

## A. Lack of Presence of Value Cushion and Lack of Value Decline Resulting From Debtor's Use

Assuming, arguendo, that decline in collateral value rather than decline in security interest value is relevant for adequate protection purposes, I am not persuaded Bay-Bank had any collateral value cushion above its debt, so as to be entitled to accrue interest and legal expenses under section 506(b). I believe I found early in the cash collateral hearings that BayBank was undersecured.

■ Nor am I persuaded that the Debtors' use and sale of BayBank's collateral caused a decline in collateral value. To qualify for senior priority, BayBank's claim must be one "arising from the ... use [or] sale of such property under section 363...." 11 U.S.C. § 507(b) (1988). It must therefore be established that any decline in value was caused by the Debtors' use or sale of the collateral between the filing date of October 16, 1989 and March 7, 1990, when the court's last authorizing order expired.

■ BayBank's execution and filing of this claim constitutes "prima facia evidence" of its "validity and amount." Fed.R.Bank.P. 3001(f). This means the Debtors had the burden of going forward at the hearing with evidence, but BayBank retained the ultimate burden of proof. *Whitney v. Dresser*, 200 U.S. 532, 26 S.Ct. 316, 50 L.Ed. 584 (1906); 3 Lawrence P. King et al., *Collier on Bankruptcy*, ¶ 502.01 (15th ed. 1993). At the hearing, the Debtors contended their program of gradual liquidation enhanced rather than decreased the value of BayBank's security interest. Activities of a debtor can enhance collateral value and thereby provide adequate protection. *In re Ledgemere Land Corp.*, 125 B.R. 58 (Bankr.D.Mass.1991) (completion of partially constructed development added value in excess of priming construction loan lien). The Debtors' case incorporated all that had transpired at the prior hearings. Neither party sought to put in further evi-

1988) (absence of order providing adequate protection takes case outside statute).

dence. In short, the Debtors sustained their burden of going forward with the evidence.

■ I conclude BayBank has not sustained its ultimate burden of proving the Debtors' use and sale of its collateral caused a decline in the value of its collateral. BayBank relies upon book value figures, pointing out that the book value of its collateral exceeded its debt on October 16, 1989. The value relevant for adequate protection purposes, however, is not book value. It is liquidation value realizable by the creditor. *In re Robbins,* 119 B.R. 1 (Bankr.D.Mass.1990). I was convinced during the cash collateral hearings that the bulk sales which the Debtors were conducting generated more for BayBank than BayBank could generate on its own. BayBank would have been faced with a horrendous problem in liquidating this huge inventory of over 10,000 different items. By its own admission at the cash collateral hearings, it would have had to call in a liquidator. That liquidator would not have had the knowledge of the business or the relationship with customers possessed by the Debtors' officers and employees. BayBank retorts that it obtained a relatively high percentage of book value for the remaining inventory items which it did liquidate at the end. But those items were relatively few compared to the inventory at the beginning. I am unpersuaded that BayBank could have done any better than the Debtors did, much less $2,212,168 better.

In summary, BayBank has established neither the presence of a value cushion above its debt as a basis for a section 506(b) claim for postfiling interest and legal fees, nor the occurrence of any postpetition decline in the value of its security interest as a basis for a claim under section 507(b) that it has been deprived of adequate protection.

## B. *Disappearance of Equity Cushion as Denial of Adequate Protection*

■ There is a second reason why BayBank has not been deprived of adequate protection. Even if it could have realized $2,212,168 in excess of its initial debt balance, deprivation of that value cushion does not constitute denial of adequate protection.

Most of this claim consists of postfiling interest. The Supreme Court has laid to rest the proposition that the right to adequate protection includes the ability to accrue interest. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). *Timbers* of course involved a creditor who was undersecured at the filing date. But if a creditor does not lack adequate protection because of the absence of a value cushion at the beginning, it is hardly logical to conclude that later disappearance of the cushion means the creditor has been deprived of adequate protection.

Analysis of the relevant Code sections bears this out. Section 363 concerning a debtor's use and sale of collateral requires adequate protection of only the creditor's "interest in property." 11 U.S.C. § 363(e) (1988). Comparison of the language of subsections 506(a) and 506(b) discloses the meaning of the phrase "interest in property" as it applies to an oversecured creditor. Section 506(b) grants the oversecured creditor (subject to any section 506(c) claim) a claim for postfiling interest and legal fees to the extent of his collateral cushion. Significantly, nowhere in this subsection is their reference to the creditor's "interest in property." Instead, the subsection speaks only in terms of "property" and its "value." 11 U.S.C. § 506(b) (1988). Section 506(a), on the other hand, does refer to the creditor's "interest in ... property," and provides that a claim "is a secured claim to the extent of the value of such creditor's interest ... in such property." 11 U.S.C. § 506(a) (1988). Because section 506(a) determines the amount of a claim, this reference is clearly not to the value of the collateral. That value is the subject of subsection (b) where the creditor is oversecured. The reference must be to security interest value to the extent it does not exceed the amount of the claim.

Section 361 underscores the significance of the phrase "interest in property" in the adequate protection context. Its examples of methods of providing adequate protection are expressly stated to be for the purpose of compensating for a "decrease" in the value of the creditor's "interest in such property." 11

U.S.C. § 361 (1988). The accrual of interest and legal fees to the oversecured creditor under section 506(b) brings about an *increase* in the value of a creditor's security interest, not a decrease.

These considerations have previously persuaded me that disappearance of an equity cushion caused by an accruing senior tax lien is not equivalent to denial of adequate protection. *Andrew J. Lane*, 108 B.R. 6 (Bankr. D.Mass.1989). They apply equally to disappearance of the cushion through accruing postfiling interest and legal fees under section 506(b).

## IV. ABSENCE OF SECTION 507(a)(1) ADMINISTRATIVE EXPENSE CLAIM

There is yet another reason for disallowance of this claim. It is true, as discussed in Part II, that the legislative history indicates Congress intended section 507(b) as compensation for failed adequate protection. It appears from this legislative history that section 507(b) was enacted as part of a compromise between the House and Senate in which administrative expense priority was dropped as an acceptable method for providing adequate protection. All this would lead one to conclude that Congress wanted to protect prepetition lenders who have no administrative expense claim in the first instance. Perhaps Congress did. The difficulty is the statute provides otherwise. Its wording indicates Congress had in mind protection of secured creditors who extend credit to the bankruptcy estate after the filing.

Section 507(b) has two requirements. Its priority is available "[i]f the trustee provides adequate protection ... *and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the ... use [or] sale....*" (emphasis added). The statute's command is unmistakable. The resulting collateral deficiency claim must first be entitled to administrative expense priority under section 507(a)(1) in order to qualify for 507(b) priority. Section 507(a)(1) grants first priority to "administrative expenses allowed under section 503(b)...." 11 U.S.C. § 507(a)(1) (1988). Section 503(b), in turn, allows as administrative expenses "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after commencement of the case...." 11 U.S.C. § 503(b) (1988).

▮▮▮ BayBank has no claim for the "actual, necessary cost and expenses of preserving the estate...." Such claims are allowed for those who agree to extend postpetition credit to the bankruptcy estate as a loan or in the furnishing of goods or services. *Woburn Associates v. Kahn (In re Hemingway Transport, Inc.)*, 954 F.2d 1 (1st Cir.1992); *United Trucking Services, Inc. v. Trailer Rental Co., Inc. (In re United Trucking Services, Inc.)*, 851 F.2d 159 (6th Cir.1988); *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950 (1st Cir.1976). Congress granted this priority to offer an inducement for the postpetition extension of credit, in order to promote reorganization. *Id.* BayBank extended no credit to the estate. *Compare In re 360 Inns, Ltd.*, 76 B.R. 573, 579 (Bankr.N.D.Tex.1987) (authorized postpetition loan qualifies for section 507(b) priority). Indeed, the Debtor's need to obtain court permission for the use of BayBank's cash collateral arose from BayBank's decision not to continue to extend credit under the parties' revolving loan arrangement.

The decisions seem to have made a less literal interpretation of the statute. They conclude that section 507(b) "converts a creditor's claim where there has been diminution in the value of the creditor's secured collateral ... into an allowable administration expense claim under § 503(b)." *Bonapfel v. Nalley Motor Trucks (In re Carpet Leasing Company, Inc.)*, 991 F.2d 682, 685 (11th Cir. 1993), *quoting, Grundy Nat'l Bank v. Rife*, 876 F.2d 361, 363–4 (4th Cir.1989). What these courts fail to recognize is that section 507(b) grants superpriority only "if" the claimant has an allowable section 503(b) administrative expense claim. It does not "convert" the claim into a section 503(b) claim.

In *Carpet Center*, the trustee and the creditor had entered into a consent order continu-

ing the automatic stay in consideration of adequate protection payments. The trustee opposed the creditor's later section 507(b) claim on the ground the creditor had not furnished goods in a postpetition credit transaction. The court's response was that the trustee's consent to the Debtor's use of the collateral, and the debtor's inducement of that consent, constituted the requisite postpetition credit transaction. The court does not explain how that consented use constituted a credit transaction. *Carpet Center*, in any event, is distinguishable from the present case. BayBank strenuously opposed the Debtors' use of its collateral.

The *Carpet Center* court twisted the meaning of the statute in another way. Recognizing that postpetition "expenses" must be present under section 503(b), the court said: "When a debtor-in-possession uses a creditor's equipment to generate funds for the operation of a business in bankruptcy, the creditor's expense of providing that equipment is an actual and necessary cost of preserving the bankruptcy estate under § 503(b)." 991 F.2d at 687. The administrative "expenses" that the statute speaks of are of course expenses incurred by the estate, not the creditor. The estates of these Debtors incurred no "expenses" within the meaning of section 503(b) in the use of BayBank's collateral. *In re Briggs Transportation Co.*, 47 B.R. 6 (Bankr.D.Minn.1984) (depreciation of collateral not entitled to section 503(b) treatment due to absence of expense incurred by debtor). True, these estates would be subject to accruing postpetition interest expense to the extent BayBank's collateral value exceeded its debt, but this obligation of the estates is governed by section 506(b), not section 503(b).

### V. *CONCLUSION*

BayBank's claim is therefore not entitled to section 507(b) priority. Moreover, because BayBank has not established that its collateral value ever exceeded its debt, Bay-Bank's claim for postfiling interest and legal fees is not allowable as a nonpriority claim under section 506(b). A separate order has accordingly issued disallowing the claim in its entirety.

*ORDER*

The Debtors having objected to the $2,212,168 unsecured claim of BayBank, and the court having issued findings and conclusions thereon, pursuant to those findings and conclusions, it is hereby

ORDERED, that the unsecured claim of BayBank is disallowed in its entirety.