**FORD MOTOR CREDIT COMPANY,**
Plaintiff–Appellee,

v.

**Rayfeal C. DOBBINS, a/k/a Ray C. Dobbins; Mary Ellen Dobbins,**
Defendants–Appellants.

No. 93–1476.

United States Court of Appeals,
Fourth Circuit.

Argued March 9, 1994.

Decided Sept. 15, 1994.

**ARGUED:** John Saul Edwards, Roanoke, VA, for appellants. Benjamin C. Ackerly, Sr., Hunton & Williams, Richmond, VA, for appellee. **ON BRIEF:** Patricia L. Hobbs, Hunton & Williams, Richmond, VA, for appellee.

Before WILKINSON, HAMILTON and MICHAEL, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge WILKINSON and Judge HAMILTON joined.

## OPINION

MICHAEL, Circuit Judge:

Chapter 11 debtors Rayfeal C. and Mary Ellen Dobbins appeal from a district court decision that was favorable in several respects to creditor Ford Motor Credit Corporation (FMCC) in its pursuit of a deficiency claim. The district court reversed the bankruptcy court (1) by granting FMCC a superpriority administrative expense under 11 U.S.C. § 507(b), (2) by awarding FMCC postpetition interest under 11 U.S.C. § 506(b), and (3) by finding that the Dobbinses were not entitled to any additional credit from FMCC under a parts return agreement between Ford Motor Company (Ford) and the bankrupt car dealership owned by the Dobbinses. For the reasons that follow, we affirm in part and reverse in part. Specifically, we hold that the district court erred both in granting FMCC a § 507(b) superpriority and in awarding FMCC postpetition interest. The district court did not err, however, in concluding that the Dobbinses are not entitled to any additional credit from FMCC under the parts return agreement.

## I. *Background*

From 1970 until 1980 Mr. Dobbins operated a car dealership, Ray Dobbins Lincoln–Mercury, Inc. (the Dealership), in Roanoke, Virginia. The Dobbinses were the sole officers and shareholders of the Dealership. In 1980, as a result of financial problems, the Dealership ceased operating. On March 3, 1981, the Dealership filed a petition under Chapter 11 of the Bankruptcy Code. That same day the Dobbinses filed their own Chapter 11 petition.

FMCC provided financing to the Dealership. Specifically, FMCC provided several mortgage loans, a capital loan, and a wholesale loan, the latter of which financed the Dealership's acquisition of new and used cars. The loans were secured by certain personal property of the Dealership, including parts and equipment. The Dobbinses personally guaranteed payment of the Dealership's debt to FMCC. The Dobbinses' guaranty was secured by a deed of trust on their real property at 3112 Melrose Avenue in Roanoke, Virginia (Melrose Avenue property), which was where the Dealership was located.[1] The real property was owned by

---

1. The Dobbinses argue that their individual guaranty was not secured by the deed of trust. After reviewing the relevant documents, we disagree.

According to the terms of the original deed of trust (dated July 18, 1973), its purpose was "[t]o secure the payment of the Indebtedness and the performance and discharge of the Obligations, ...." JA 371. The term "Obligations" was defined as: "Any and all of the covenants, promises and other obligations ... made or owing by Grantor [Ray Dobbins Realty, Inc.] *or others* to or due to Beneficiary [FMCC] under and/or as set forth in the Note *and/or the Security Documents.*" JA 370 (emphases added). "Security Documents" was in turn defined to include "any and all other documents now or hereafter securing the payment of the Indebtedness...." *Id.* Finally, the term "Indebtedness" was defined as the amount due on the accompanying mortgage note (the amount of the mortgage loan). *Id.*

The Dobbinses' individual guaranty qualified as a "Security Document" because it was an "other document" securing the payment of the Indebtedness, *i.e.*, securing the amount due on the mortgage note. Working our way backwards, we believe it is clear that the term "Obligations" in the deed of trust included any and all covenants or promises made by the Dobbinses (as "others") to FMCC under the guaranty (which was a "Security Document"). Therefore, one purpose of the deed of trust was to secure the performance and discharge of the covenants or promises made by the Dobbinses in their guaranty (with respect to the mortgage loan). As for the connection between the Dobbinses' guaranty and FMCC's capital and wholesale loans to the Dealership, the deed of trust was subsequently modified on August 15, 1978, to expand the

the Dobbinses individually and was leased to the Dealership.[2]

On January 20, 1982, the bankruptcy court entered an order approving the Dealership's return of automotive parts to Ford pursuant to a parts return provision in the franchise agreement. (Ford and FMCC are separate corporate entities.) In June 1982, Ford notified the Dealership that it had rejected a large portion of the returned parts. Ford sent back the rejected parts and paid $46,682.55 for the parts it accepted. The $46,682.55 ultimately went to FMCC, which had a security interest in the parts.

Meanwhile, on April 7, 1982, FMCC moved for relief from the automatic stay (1) in the Dobbinses' bankruptcy case to foreclose on the Melrose Avenue property and (2) in the Dealership's bankruptcy case to take possession of and sell certain personal property owned by the Dealership. The bankruptcy court consolidated the motions and held a hearing, at which FMCC asserted that the value of its claim against the Dealership was $697,720.54. FMCC and the Dobbinses presented expert testimony on the value of the secured collateral. FMCC's experts valued the Melrose Avenue property at $425,000 and the remaining personal property of the Dealership at $47,731. The Dobbinses' and the Dealership's experts valued the Melrose Avenue property at $898,000 and the remaining personal property at $190,000.

On March 31, 1983, the bankruptcy court entered an order finding that "[FMCC's] interest [was] adequately protected by the equity in the subject property." JA 36. Accordingly, the court denied FMCC's motion for relief from the stay pending a hearing on the reorganization plans of both the Dealership and the Dobbinses. The court did not make any findings regarding the values of the Melrose Avenue property or the Dealership's personal property. FMCC did not appeal this order.

On November 29, 1983, the bankruptcy court issued orders confirming the plans in both cases. Paragraph Seven of the Dealership's plan said, *inter alia:*

> the debtor in possession will sell the remaining fixtures and real property of the Debtor at 3112 Melrose Avenue. Due to improving economic conditions, this sale will close on or before November 30, 1984, with the proceeds disbursed to [FMCC].... The proposed purchase price of the dealership facility at 3112 Melrose Avenue is $1.4 million. From these proceeds, the entire remaining allowed indebtedness ... owed to [FMCC] plus any allowed expenses will be paid in full.

JA 41 (¶ 7). Further, Paragraph Sixteen of that plan said that if the Melrose Avenue Property was not sold as provided in Paragraph Seven, the Dealership would be in default. In the event of such default, FMCC could file an affidavit with the court, and five days later the automatic stay would be lifted to permit FMCC to "take possession of the property and dispose of it in accordance with its rights without further action required by the Bankruptcy Court or any other court." JA 42 (¶ 16). The Dobbinses' plan incorporated by reference Paragraph Seven of the Dealership's plan and likewise said that in the event the Melrose Avenue property was not sold by November 30, 1984, the Dobbinses would be in default and FMCC could take possession.

The Dobbinses were unable to sell the Melrose Avenue property. On February 10, 1986, the bankruptcy court lifted the stay so that FMCC could sell the property. FMCC listed the property with a realty agency that specialized in marketing commercial property. On January 30, 1987, about one year after the court lifted the stay, FMCC finally sold the Melrose Avenue property for $375,000 at a private sale. The court approved the sale over the Dobbinses' objection

term "Indebtedness" to include the Dealership's obligations on those loans. JA 417–19. Thus, in the end, the Dobbinses' individual guaranty of all of the Dealership's debts to FMCC was secured by the deed of trust on the Melrose Avenue property.

**2.** This property originally was owned by Ray Dobbins Realty, Inc., leased to Ford Leasing De-

velopment Company (Ford Leasing), and in turn subleased to the Dealership. When the Dobbins realty company was dissolved in 1980, the property was conveyed to the Dobbinses. Ford Leasing terminated the leasing arrangement shortly before the Dealership declared bankruptcy.

that the price was too low. After sale-related costs and expenses were deducted, the net sale proceeds ($301,123.83) were applied to FMCC's claim.

Following the sale, FMCC filed a Second Amended Proof of Claim in the Dobbinses' bankruptcy case for its deficiency in the amount of $545,639.41, which included post-petition interest, legal fees and expenses.[3] Significantly, in its Second Amended Proof of Claim FMCC sought a superpriority administrative expense under 11 U.S.C. § 507(b) for the alleged decrease in the value of the Melrose Avenue property from the date of the adequate protection order to the date of the sale. The Dobbinses objected to FMCC's claim on several grounds. After a hearing, the bankruptcy court ruled on March 19, 1992, that FMCC was not entitled to a § 507(b) superpriority in the Dobbinses' bankruptcy case because

> any superpriority administrative expense of FMCC under § 507 would be assertable only against the estate of the principal debtor, the dealership.... The priority cannot be transferred with prejudice to the Dobbins' Chapter 11 creditors. As to the Dobbins' Chapter 11 creditors, FMCC's guaranty claims are simply those of an unsecured creditor and cannot be elevated ahead of other unsecured creditors.

JA 249. The bankruptcy court also concluded that FMCC, as an undersecured creditor, was not entitled to postpetition interest, legal

fees or other expenses. Finally, the court found that Ford agreed to pay to the Dealership $88,000 for returned parts pursuant to the parts return agreement; because FMCC only credited the Dobbinses for the $46,682.55 paid by Ford, the bankruptcy court concluded that the Dobbinses were entitled to an additional credit of $41,317.45 from FMCC ($88,000 minus $46,682.55). In the final analysis, the bankruptcy court concluded that FMCC had an unsecured claim in the Dobbinses' case in the amount of $72,406.83.[4]

FMCC appealed the bankruptcy court's order, and on February 11, 1993, the district court reversed the bankruptcy court in several respects. The district court held, *inter alia:* (1) that FMCC was entitled to a § 507(b) superpriority in the amount of $322,720.54[5] because the "adequate protection" proved to be inadequate; (2) that FMCC was entitled to postpetition interest on its claim because, although it was undersecured when the Melrose Avenue property was sold, it was oversecured earlier in the bankruptcy proceedings; and (3) that the Dobbinses were not entitled to any additional credit from FMCC under the parts return agreement.

The Dobbinses filed this appeal, contending that the district erred: (1) in granting FMCC a § 507(b) superpriority, (2) in awarding FMCC postpetition interest, and (3) in concluding that the parts return agree-

---

**3.** It appears from the docket sheet that FMCC did not file an amended proof of claim in the Dealership's case for this deficiency. During the course of the bankruptcy proceedings, equipment and other personal property owned by the Dealership had been auctioned off, with the proceeds applied to FMCC's claim. The Dealership had liquidated most of its inventory of automobiles by the time the Chapter 11 petitions were filed. Thus, when FMCC filed its Second Amended Proof of Claim in the Dobbinses' case, no assets remained in the Dealership's estate from which FMCC could realize further recovery on the Dealership's debt.

**4.** This figure was derived as follows. The balances on the wholesale and mortgage loans were $84,962.87 and $448,997.05, respectively, for a total loan balance of $533,959.92 (the principal on the capital loan had been paid off before the Dealership declared bankruptcy). From this amount the court subtracted the $119,111.71 recovered by FMCC during the course of the bank-

ruptcy proceedings (from the sale of the parts and equipment, etc.). This left a debt balance of $414,848.21. From this amount the court subtracted $301,123.83, the net proceeds realized from the sale of the Melrose Avenue property, leaving a debt balance of $113,724.38. Finally, the court credited the Dobbinses with an additional $41,317.45 under the parts return agreement, yielding a final total outstanding debt of $72,406.83. (The actual debt balance should be $72,406.93; the bankruptcy court was off by a dime.)

**5.** This figure represented the hypothesized decline in value between the date of the adequate protection order and the ultimate sale. The district court speculated that, at the date of the adequate protection order, the Melrose Avenue property must have been worth at least the value of FMCC's claim—$697,720.54. The sale price was $375,000. Subtracting $375,000 from $697,720.54, the court arrived at the $322,720.54 figure.

ment did not entitle the Dobbinses to an additional $41,317.45 credit from FMCC. For the reasons that follow, we hold that the district court erred in granting FMCC a superpriority and in awarding FMCC postpetition interest. In addition, we hold that the district court did not err in concluding that the Dobbinses were not entitled to an additional credit from FMCC under the parts return agreement.

## II. *Standard of Review*

 "This court reviews questions of statutory interpretation de novo." *Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet, Inc.)*, 26 F.3d 481, 483 (4th Cir.1994). "With respect to the Bankruptcy Court's findings of fact, the appropriate standard of review is whether such findings are clearly erroneous." *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir.1991); Bankruptcy Rule 8013. " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). "[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." *Farouki v. Emirates Bank Int'l Ltd.*, 14 F.3d 244, 250 (4th Cir.1994) (quoting Bankruptcy Rule 8013).

## III. *§ 507(b) Superpriority*

FMCC contends that it is entitled to a superpriority administrative expense under § 507(b) because the value of the Melrose Avenue property declined after the adequate protection order, with the property eventually selling for less than the amount of FMCC's claim. In short, adequate protection proved to be inadequate. Section 507(b) provides:

> If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor

and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

It is apparent from the language of § 507(b) that a creditor must satisfy several requirements in order to trigger the superpriority. First, adequate protection must have been provided previously, and the protection ultimately must prove to be inadequate. Second, the creditor must have a claim allowable under § 507(a)(1) (which in turn requires that the creditor have an administrative expense claim under § 503(b)). And third, the claim must have arisen from either the automatic stay under § 362; or the use, sale or lease of the collateral under § 363; or the granting of a lien under § 364(d). For the reasons that follow, we conclude that FMCC is not entitled to a § 507(b) superpriority because it does not meet the second requirement above, *i.e.*, it does not have a claim allowable under § 507(a)(1).

### A. *The requirement of a § 503(b) administrative expense*

 "The presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among the creditors. Thus, statutory priorities must be narrowly construed." *In re James B. Downing & Co.*, 94 B.R. 515, 519 (Bankr.N.D.Ill.1988) (citing *Joint Indus. Bd. v. United States*, 391 U.S. 224, 228, 88 S.Ct. 1491, 1493–94, 20 L.Ed.2d 546 (1968)). Heeding this principle, we begin with the language of § 507(b), which allows a superpriority only to a claim otherwise allowable under § 507(a)(1). *In re Severson*, 53 B.R. 8, 9 (Bankr.D.Or.1985). Section 507(a)(1), in turn, allows a claim for "administrative expenses allowable under § 503(b)...." 11 U.S.C. § 507(a)(1). For our purposes, the administrative expenses allowable under § 503(b) are "the actual, necessary costs and expenses of preserving the

estate...." 11 U.S.C. § 503(b)(1)(A). Thus, FMCC cannot receive a § 507(b) superpriority unless it can demonstrate that it has incurred postpetition an actual and necessary cost or expense of preserving the Dobbinses' estate. *Cf. General Amer. Transp. Corp. v. Martin (In re Mid Region Petroleum, Inc.),* 1 F.3d 1130, 1132 (10th Cir.1993) ("the party claiming entitlement to administrative expense priority [under § 503(b) ] has the burden of proof").

"The modifiers 'actual' and 'necessary' must be observed with scrupulous care[,]" 3 L. King, *Collier on Bankruptcy* ¶ 503.-04[1][a][i] at 503–24 (15th ed. 1991), because

> [o]ne of the goals of Chapter 11 is to keep administrative costs to a minimum in order to preserve the debtor's scarce resources and thus encourage rehabilitation. In keeping with this goal, § 503(b)(1)(A) was not intended to "saddle debtors with special post-petition obligations lightly or give preferential treatment to certain select creditors by creating a broad category of administrative expenses."

*Mid Region Petroleum,* 1 F.3d at 1134 (citations omitted) (quoting *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 891, 897 (Bankr.E.D.Pa.1987)).

█ Section 503(b) thus must be narrowly construed. *Burlington N. R.R. v. Dant & Russell, Inc. (In re Dant & Russell Inc.),* 853 F.2d 700, 706 (9th Cir.1988).

> This ... narrow interpretation requires *actual use* of the creditor's property by the debtor, thereby conferring a *concrete benefit* on the estate before a claim is allowable

as an administrative expense. Accordingly, *the mere potential of benefit to the estate is insufficient* for the claim to acquire status as an administrative expense. The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience by virtue of the debtor's possession of its property.*

*In re ICS Cybernetics, Inc.,* 111 B.R. 32, 36 (Bankr.N.D.N.Y.1989) (citations omitted) (emphases added); *accord Dant & Russell,* 853 F.2d at 706 (under 503(b)(1)(A), "[a]n actual benefit must accrue to an estate"); *In re Allen Care Ctrs., Inc.,* 163 B.R. 180, 188 (Bankr.D.Or.1994) ("[t]he benefit to the estate must be actual, not potential"); *Broadcast Corp. v. Broadfoot,* 54 B.R. 606, 611 (N.D.Ga.1985) ("administrative expense scheme does not focus in the first instance on whether a creditor sustained a loss during this period, but on whether the estate has received an actual benefit"), *aff'd, In re Subscription Television,* 789 F.2d 1530, 1532 (11th Cir.1986) ("[t]hat which is actually utilized by a trustee in the operation of a debtor's business ... should be accorded the priority of an administrative expense").

█ With this background in mind, we examine FMCC's argument, which essentially boils down to this: The Dobbinses used, and the Dobbinses' estate received a benefit from, the Melrose Avenue property in that the Dobbinses had the opportunity to market the property.[6] We are presented with a close question here, but we do not believe that the mere opportunity to market collater-

---

6. It appears that after they filed their Chapter 11 petition, the Dobbinses initially intended to sell *or lease* the Melrose Avenue property. The subsequent reorganization plans of both the Dobbinses and the Dealership, however, expressly provided that the Dobbinses were to sell rather than lease the various items of collateral. For example, the Dealership's plan said that the Dobbinses would "sell the remaining fixtures and real property of the Debtor at 3112 Melrose Avenue" and that the "sale [would] close on or before November 30, 1984." JA 41. This portion of the Dealership's plan was incorporated by reference in the Dobbinses' plan.

In their briefs, both the Dobbinses and FMCC casually indicate that the Melrose Avenue property was leased postpetition both before and after the bankruptcy court lifted the stay in February 1986. Specifically, it appears that starting in the summer of 1981 the property was leased to a car dealership (Meador), and from March 1986 through January 1987, part of the property was leased to a bingo operation with the lease payments ultimately going to FMCC. As for the latter leasing arrangement, because FMCC was in possession of the property after the court lifted the stay in February 1986 (the court lifted the stay so that FMCC could take possession, and the Dobbinses handed the keys over to FMCC), arguably any use of the property after this date should not be attributed to the Dobbinses. As for the lease to Meador, we do not have any details of that leasing arrangement before us. FMCC has not pressed the argument, either in its brief or at oral argument, that the Meador lease triggered a § 507(b) superpriority.

al is the type of concrete, actual benefit contemplated by § 503(b)(1)(A). "Although this opportunity is advantageous to the [debtor-in-possession], it is not the type of benefit which is provided administrative expense protection because a benefit to the estate results only from use of the ... property." *Mid Region Petroleum,* 1 F.3d at 1133 (creditor not entitled to § 503(b) administrative expense based on mere opportunity to maintain possession postpetition of leased railcars or opportunity to sell debtor's business with leases intact; "the railcars were never used postpetition"). *Compare In re J.F.K. Acquisitions Group,* 166 B.R. 207, 212 (Bankr. E.D.N.Y.1994) ("the Debtor's use of the Hotel [collateral] and its proceeds went to maintain the property and operate the business" and therefore "[t]he use of the collateral was an actual and necessary cost of preserving the estate"). As the Eleventh Circuit has observed:

> That which is actually utilized by a Trustee in the operation of a debtor's business is a necessary cost and expense of preserving the estate [under § 503(b)] and should be accorded the priority of an administrative expense. That which is thought to have some potential benefit, in that it makes a business more likely salable, may be a benefit but is too speculative to be allowed as an "actual, necessary cost and expense of preserving the estate."

*Broadcast Corp. v. Broadfoot (In re Subscription Television),* 789 F.2d 1530, 1532 (11th Cir.1986) (creditor was obligated to keep broadcast signal available for trustee for sixty-day period, causing creditor to be deprived of signal's use; court held that creditor was not entitled to administrative claim for period of time during which signal was available for, but not actually used by, the trustee), *ICS Cybernetics,* 111 B.R. at 37–38 (mere retention of collateral as available inventory was insufficient to constitute administrative expense because "the potential benefit to the estate provided by storage of equipment does not typically rise to the level of actual use"). *But see In re Fred Sanders Co.,* 22 B.R. 902, 905 (E.D.Mich. 1982).

In sum, there is a critical distinction between an actual benefit to the estate resulting from the actual postpetition use of collateral and a potential benefit to the estate resulting from a debtor's mere possession of collateral. This distinction, among others, separates the instant case from our decision in *Grundy Nat'l Bank v. Rife,* 876 F.2d 361 (4th Cir.1989), upon which FMCC relies. *Grundy* involved the typical § 507(b) scenario: The debtor in possession actually used postpetition the collateral (two automobiles) in an effort to reorganize his business (vacuum cleaner salesman); the use of the collateral was essential to the reorganization of the debtor's business; and the use caused a decline in the collateral's value. *Id.* at 363–64. Thus, *Grundy* involved an actual use by the estate, not a mere opportunity to benefit. *See id.* at 363 ("a debtor's estate is obligated to pay for collateral it controls and uses for the benefit of the estate"). The Eleventh Circuit's decision in *In re Carpet Center Leasing,* 991 F.2d 682 (11th Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 1069, 127 L.Ed.2d 388, upon which FMCC also relies, likewise is not on point because the debtor there "enjoyed more than mere potential post-petition use of collateral [trucks]. Rather than entertaining a speculative benefit, the Trustee actively used [the] collateral throughout its post-petition possession.... [The creditor was] entitled to an administrative expense priority because the Trustee actually used the collateral to the benefit of the debtor's estate." *Id.*[7]

---

7. It may seem odd that a § 503(b) administrative expense can be created by a debtor's postpetition use (against the secured creditor's wishes) of collateral which the debtor had also used before going bankrupt. It seems odd because when we think of § 503(b) administrative expense claims, we think of claims "allowed for those who agree to extend postpetition credit to the bankruptcy estate as a loan or in the furnishing of goods or services." *In re Ralar Distrib., Inc.,* 166 B.R. 3, 8 (Bankr.D.Mass.1994) ("Congress granted this priority to offer an inducement for the postpetition extension of credit, in order to promote reorganization."); *see* Brief of Appellants at 17 (the Dobbinses emphasize that FMCC provided no "new money" to the estate postpetition). It may seem like somewhat of a stretch, then, to say that a creditor whose collateral is being used by the debtor against the creditor's wishes somehow is extending postpetition credit to the estate. But, as we said in *Grundy,* "what constitute

■ FMCC's theory is that a debtor's opportunity to benefit from the continued possession postpetition of collateral constitutes an actual and necessary cost of preserving the estate for purposes of § 503(b)(1)(A). But every time a bankruptcy court denies a secured creditor's motion to lift the stay the debtor is given some "opportunity" to benefit from the continued possession of the collateral (e.g., to use, lease or sell it). Thus, were we to adopt FMCC's theory, we would be hard pressed to find a case where a creditor would not be entitled to a superpriority after adequate protection proved inadequate. In effect, FMCC would have us read out of § 507(b) Congress' requirement (in its cross-reference to § 503(b)) that the creditor must have incurred an actual and necessary cost of preserving the estate. This we decline to do, for the Supreme Court has made clear that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (§ 506(b) case) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *see also Patterson v. Shumate*, —— U.S. ——, ——, 112 S.Ct. 2242, 2248, 119 L.Ed.2d 519 (1992) (if the text of the Code is clear, the party seeking to

defeat plain meaning bears an "exceptionally heavy burden") (internal quotation marks omitted). Because a literal application of § 507(b) would not produce a result demonstrably at odds with Congressional intent, we must reject FMCC's broad conception of "use" and "benefit." [8]

We appreciate that FMCC wants to be compensated for the delay and related opportunity loss occasioned by the Dobbinses' continued possession of its collateral. And we agree that in many cases "it would be inequitable to tax the creditor with the burden of the court's error if the judicially determined adequate protection later proves to be 'inadequate.'" *Cheatham v. Central Carolina Bank & Trust Co. (In re Cheatham)*, 91 B.R. 382, 387 (E.D.N.C.1988). However, it also strikes us as inequitable to tax unsecured creditors for a decline in the value of collateral when the decline does not result from a use that actually benefits the estate: "To prioritize ... claims where they are not clearly entitled to such treatment, is not only inconsistent with the policy of equality of distribution but it also dilutes the value of the priority for the claims of creditors Congress in fact intended to prefer." *In re Chicago, M., St. P. and Pac. R.R.*, 658 F.2d 1149, 1163 (7th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982).

actual and necessary costs and expenses of preserving the estate might well be opened to judicial construction." *Grundy*, 876 F.2d at 364 (internal quotation marks omitted). It is this flexible judicial construction of § 503(b) which allows us to suggest that a creditor extends postpetition credit when in reality the creditor—who is forced to allow the debtor's continued use of collateral after the debtor slides into bankruptcy—extends no credit at all. But we will only stretch so far: Were we to allow a mere potential benefit to the estate to constitute an administrative expense claim, we would dilute § 503(b) to the point where it would become meaningless. To avoid that undesirable result, we interpret the terms "actual" and "necessary" with care and we require an *actual use* by (and therefore an actual benefit to) the estate for a creditor to have a § 503(b) claim. *Cf. In re Baldwin–United Corp.*, 43 B.R. 443, 454 (S.D.Ohio 1984) (a "court has reasonable discretion in interpreting the provisions of § 503 .... [but] [i]t is clear that, whatever the boundaries of that discretion

might be, it does not include the power to go beyond the clear intent and well-established construction of the provisions of the statute").

8. We also must reject FMCC's invitation to peruse § 507(b)'s legislative history. As one bankruptcy court has recently observed: Section 507(b)'s scant legislative history "would lead one to conclude that Congress wanted to protect prepetition lenders who have no administrative expense claim in the first instance. Perhaps Congress did. The difficulty is the statute provides otherwise." *Ralar Distributors*, 166 B.R. at 8 ("[S]ection 507(b) grants a superpriority only 'if' the claimant has an allowable section 503(b) administrative expense claim."). "[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Ron Pair*, 489 U.S. at 241, 109 S.Ct. at 1030 (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).

### B. Conclusion

 We conclude that FMCC has not shown that its claim represents an actual and necessary cost or expense of preserving the estate and therefore the district court erred in granting FMCC a § 507(b) superpriority. Specifically, we hold that, in order to avoid rendering meaningless § 507(b)'s express requirement of a § 507(a)(1) administrative expense, § 507(b) requires something more than the mere opportunity of the debtor to market the secured collateral. We emphasize that our holding is narrow. We do not purport to provide a rigid definition of what constitutes an "actual benefit" to the estate for purposes of § 507(b); rather, that which constitutes an actual benefit must be determined on a case-by-case basis. *Cf. In re Callister,* 15 B.R. 521, 530 (Bankr.D. Utah 1981) ("[Section 507(b) ] is a confederation of principles; it cannot be 'construed' to favor one at the expense of another; it should be interpreted to account for the merits of all. Hence, equitable considerations, arising from the facts of each case, should be examined.").[9]

### IV. Postpetition Interest Under § 506(b)

 FMCC says it is entitled to postpetition interest on its various loans to the Dealership. The general rule is that interest stops accruing when the bankruptcy petition is filed. *See* 11 U.S.C. § 502(b)(2). However, in § 506(b) Congress carved out an exception for oversecured creditors. Section 506(b) reads:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). "Section 506(b)'s denial of postpetition interest to undersecured creditors merely codified pre-Code bankruptcy law, in which that denial was part of the conscious allocation of reorganization benefits and losses between undersecured and unsecured creditors." *United Savings Ass'n v. Timbers of Inwood Forest,* 484 U.S. 365, 373, 108 S.Ct. 626, 631, 98 L.Ed.2d 740 (1988).

The first and critical inquiry under § 506(b) is whether FMCC is oversecured. The Dobbinses argue, and the bankruptcy court found, that FMCC is undersecured for purposes of § 506(b) because the Melrose Avenue property ultimately sold for an amount less than FMCC's secured claim. FMCC concedes that, if we use the sale price to determine the value of the collateral for purposes of § 506(b), then it is undersecured. But, FMCC urges, although it was undersecured at the time of sale, it was oversecured earlier in the bankruptcy proceedings—the value of the Melrose Avenue property simply declined between the filing of the petition and the time the property was sold.[10] FMCC contends that so long as a creditor is oversecured at some point postpetition, the creditor should be treated as an oversecured creditor for purposes of § 506(b), even if the

---

9. Having held that FMCC does not have a claim within the scope of § 507(a)(1), we need not address the Dobbinses' alternative arguments, the primary one being that the decline in value of the Melrose Avenue property was not caused by the stay. *See In re Second Timmon Hotel Co., Ltd.,* 91 B.R. 985, 988 (Bankr.M.D.Fla.1988) ("In order for a creditor to sustain a claim under § 507(b), it must prove that the loss was caused solely by the imposition of the automatic stay."); *In re Colter, Inc.,* 53 B.R. 958, 961 (Bankr. D.Colo.1985) (superpriority allowed "to the extent that the stay in bankruptcy has actually reduced the value of the collateral").

10. The bankruptcy court's March 31, 1983, adequate protection order did not say whether FMCC was in fact oversecured, but (nine years later) the court's March 19, 1992, order concerning FMCC's Second Amended Proof of Claim said that the March 31, 1983, order "found FMCC to be an oversecured creditor of the dealership." JA 248. Nevertheless, because the bankruptcy court never made any findings regarding the values of either the Dealership's personal property or the Melrose Avenue property (both of which were at issue when the court found FMCC to be adequately protected), we have no idea to what extent FMCC was in fact oversecured at the time of the adequate protection order. Fortunately, because we conclude that FMCC should be treated as an undersecured creditor for purposes of § 506(b), we need not wrestle with the valuation problem.

creditor ultimately ends up undersecured when the collateral is sold. The district court agreed with FMCC and reversed the bankruptcy court.

■ The concise issue before us is this: When determining if and to what extent the value of secured collateral exceeds the value of a secured creditor's claim for purposes of § 506(b), if the collateral has been sold, should the value of the collateral be the sale price or, alternatively, some other valuation made earlier in the Chapter 11 proceedings? We hold that when secured collateral has been sold, so long as the sale price is fair and is the result of an arm's-length transaction, courts should use the sale price, not some earlier hypothetical valuation, to determine whether a creditor is oversecured and thus entitled to postpetition interest under § 506(b). *Cf. Textile Banking Co. v. Widener*, 265 F.2d 446, 452 (4th Cir.1959) ("since the proceeds from [the sale of] the property covered by Textile's lien were insufficient to pay the principal of the debt it was not entitled to collect interest from the bankrupt"); *accord Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.)*, 151 B.R. 931, 935 (9th Cir. BAP 1993) ("Here, there was an actual sale.... The value of [the creditor's] secured claim [for purposes of § 506(b)] should have been determined by reference to the actual sale proceeds."); *In re Dowco Petroleum, Inc.*, 137 B.R. 207, 209–11 (Bankr.E.D.Tex.1992) (using sale price); *Noland v. Williamson (In re Williamson)*, 94 B.R. 958, 966 (Bankr.S.D.Ohio 1988) (same); *In re Mitchell*, 81 B.R. 171, 173 (Bankr. D.Colo.1988) (same); *In re Laza*, 69 B.R. 669, 670 (Bankr.E.D.N.Y.1987) (same); *Leasing Service Corp. v. Eastern Equip. Co. (In re Eastern Equip. Co.)*, 11 B.R. 732, 740 (Bankr.S.D.W.Va.1981) (same), *vacated on other grounds*, 27 B.R. 980 (S.D.W.Va.1983).

As one commentator has observed in the context of discussing the valuation of collateral for purposes of § 506:

If an actual disposition is to occur, regardless of the purpose of the valuation, the value of the collateral should be based on the consideration to be received by the estate in connection with the disposition, provided that the court determines such

consideration is fair and was arrived at on an arm's-length basis. Inasmuch as the price and related terms of the disposition will indicate the value of the property to be disposed of, valuation should not be a substantial issue in the context of such an actual disposition....

3 L. King, *Collier on Bankruptcy* ¶ 506.04[2] at 506–27 (15th ed. 1991). Using the sale price thus makes practical sense because it is "conclusive evidence of the property's value," *Alpine Group*, 151 B.R. at 935, and it is the amount of money the collateral actually was able to bring into the estate for distribution.

Moreover, valuing the collateral for purposes of § 506(b) on the basis of sale price arguably is the methodology most true to the text of that section. Section 506(b) says that when determining the value of secured collateral, we should subtract any recovery under § 506(c). Section 506(c) in turn says that the trustee may recover from secured property "the reasonable, necessary costs and expenses of ... *disposing of*, such property...." 11 U.S.C. § 506(c) (emphasis added). "A valuation of collateral which is sold, therefore, must necessarily be made at the time of the sale, since the first deductions from the sale proceeds to determine value are the costs of sale." *In re Broomall Printing Corp.*, 131 B.R. 32, 34 (Bankr.D.Md. 1991).

In any event, even if the text of § 506(b) is equivocal on this point, the use of sale price to determine the collateral's value best effectuates the policy behind § 506(b). Section 506(b) simply codified pre-Code bankruptcy law: "It was considered unfair to allow an undersecured creditor to recover interest from the estate's unencumbered assets before unsecured creditors had recovered any principal." *Timbers*, 484 U.S. at 373, 108 S.Ct. at 631–32; *see N.S.C. Contractors, Inc. v. Twin Parks Ltd. Partnership (In re Twin Parks Ltd. Partnership)*, 720 F.2d 1374, 1377 (4th Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984). But if, as FMCC urges, we value the collateral on the basis of a hypothetical valuation made earlier in the proceedings, and if that earlier valuation is higher than the sale price, then every dollar of postpetition interest awarded

above the sale price is a dollar usurped from the estate's unencumbered assets, a dollar that would otherwise be available for distribution to unsecured creditors. By using sale price, we avoid this inequitable result. Of course, secured creditors may benefit by a § 506(b) valuation based on sale price if the collateral appreciates postpetition and the property is sold for more than it was appraised earlier in the proceedings. *See, e.g., Alpine Group*, 151 B.R. at 935.

In sum, when valuing secured collateral to determine whether a creditor is oversecured and thus entitled to postpetition interest pursuant to § 506(b), if the collateral has been sold, the value of the collateral should be based on the consideration received by the estate in connection with the sale, provided that the sale price is both fair and the result of an arm's-length transaction. Here, because the net consideration received in connection with the sale of the Melrose Avenue property is less than the amount of FMCC's claim, FMCC is an undersecured creditor for purposes of § 506(b) and thus is not entitled to any postpetition interest.

## V. *Parts Return Agreement*

The franchise agreement between Ford and the Dealership provided that Ford would buy back parts from the Dealership upon the Dealership's termination. After it filed for bankruptcy, the Dealership sought to take advantage of this provision and entered into a parts return agreement with Ford. On January 20, 1982, the bankruptcy court issued an order, agreed to by FMCC's counsel, approving the parts return agreement. In May 1982, the Dealership shipped its parts to Ford. On June 16, 1982, Ford advised the Dealership that it had inspected the parts and that it was rejecting a good portion of them. Ford paid $46,682.55 for the parts it accepted, and the money ultimately went to FMCC, which had a security interest in the parts. FMCC, in turn, credited the Dobbinses for that amount.

The Dobbinses argue that under the parts return agreement Ford promised to pay $88,000 for the parts and therefore FMCC should have credited the Dobbinses' account for the full $88,000. The Dobbinses present the following evidence to show that Ford had promised to pay $88,000 for the parts: (1) Mr. Dobbins' testimony that Ford promised to pay $88,000; (2) the testimony of the Dealership's former parts manager, David Davis, who opined that the parts shipped back to Ford were worth between $100,000 and $105,000; and (3) a confidential interoffice memorandum from Ford's Parts and Service Division, dated August 25, 1991, which said, "Value of Returns Not To Exceed $88,000 . . . ." JA 323. The Dobbinses argue that FMCC (as opposed to Ford) should be bound by the $88,000 figure notwithstanding the facts that Ford rejected a good portion of the parts and that FMCC is a separate legal entity from Ford. Specifically, the Dobbinses say they are entitled to an additional credit from FMCC in the amount of $41,317.45 (the $88,000 "promised" by Ford minus the $46,682.55 credited by FMCC and paid by Ford for the parts it accepted).

The bankruptcy court agreed with the Dobbinses and held they were entitled to an additional $41,317.45 of credit from FMCC. The district court reversed the bankruptcy court's finding for several reasons, and we agree with the district court.

First, the bankruptcy court made a clearly erroneous finding insofar as it found that Ford promised to pay $88,000 under the parts return agreement. The confidential interoffice memorandum upon which the bankruptcy court relied heavily did not say that Ford would pay an amount *"not less than* $88,000"—as the bankruptcy court found, JA 254 (emphasis added)—it said "Value of Returns *Not To Exceed* $88,000." JA 323 (emphasis added). None of the other evidence presented by the Dobbinses can rescue the bankruptcy court's erroneous reading of the confidential memorandum. In particular, as for Davis' opinion regarding the value of the parts, this has nothing to do with whether Ford agreed to pay $88,000 for the parts. As for Mr. Dobbins' testimony, he presented no contract or other writing to show that $88,000 was promised. In fact, the record indicates that it would have been unreasonable for Mr. Dobbins to believe that Ford agreed to any set amount: On September 21, 1981, Ford notified the Dealership by

letter that "[t]he parts you return must be salable so that they can be returned to stock without repair or repackaging and resold to another dealer." JA 307. The clear implication of this statement is that Ford would pay only for salable parts, the value of which could not have been determined until Ford received and inspected them.

 Second, we agree with the district court that FMCC had nothing to do with the terms of the parts return agreement, the rejection of the parts, or the valuation of the parts. Quite simply, the parts return agreement was a matter between Ford and the Dealership, and FMCC and Ford are separate entities; the former is a wholly-owned subsidiary of the latter. We are not persuaded by the Dobbinses' argument that FMCC somehow became a party to the parts return agreement when it, as a secured creditor with a security interest in the parts, approved that arrangement.

In sum, we hold that the Dobbinses were not entitled to an additional credit of $41,317.45 from FMCC under the parts return agreement.

### VI. Conclusion

The district court erred in concluding (1) that FMCC was entitled to a § 507(b) superpriority administrative expense and (2) that FMCC was entitled to postpetition interest. The district court did not err in concluding that the parts return agreement did not entitle the Dobbinses to any additional credit from FMCC. In the final analysis, absent any modifications by the bankruptcy court on remand, FMCC appears to have a general unsecured claim against the Dobbinses in the amount of $113,724.38.[11] We remand to the district court with instructions to remand to the bankruptcy court for proceedings consistent with this opinion.

11. The bankruptcy court concluded that the Dobbinses owed FMCC a total of $72,406.83, which actually should be $72,406.93, see supra note 4, and that FMCC had a general unsecured claim for this amount. Our opinion departs from the bankruptcy court only on the parts return issue.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

On that issue, the bankruptcy court erroneously concluded that the Dobbinses were entitled to an additional credit of $41,317.45. Stripping away that erroneous $41,317.45 of credit yields a total outstanding unpaid debt of $113,724.38 ($72,406.93 plus $41,317.45).