216 B.R. 175 (1997)
In re A.H. ROBINS COMPANY, INC., Debtor.
Employer's Tax Identification No. XX-XXXXXXX.
Claire NELSON, Movant,
v.
DALKON SHIELD CLAIMANTS TRUST, Respondent.
No. 85-01307-R.
United States District Court, E.D. Virginia, Richmond Division.
December 18, 1997.
*176 Charles E. Dibble, Contoocook, NH, for Movant, Claire Nelson.
Robert V. Costello, Schneider, Reilly, Zabin & Costello, Boston, MA, for Roberta Wiltshire.
Orran Lee Brown, Richmond, VA, for Dalkon Shield Claimants Trust.

MEMORANDUM
MERHIGE, District Judge.
This matter is before the Court on the Motion to Interpret (Docket No. 29907) filed by Dalkon Shield Claimant Claire R. Nelson ("Ms.Nelson"), seeking an Order from this Court allowing her to recover prejudgment interest under New Hampshire law on her Dalkon Shield personal injury claim. She is supported in that effort by Dalkon Shield Claimant Roberta Wiltshire ("Ms. Wiltshire"), who asked the Court in her Memorandum (Docket No. 30068) to permit her to recover prejudgment interest under Massachusetts law on her Dalkon Shield personal *177 injury claim. The Dalkon Shield Claimants Trust (the "Trust") filed a Response opposing the requests for prejudgment interest (Docket No. 29943). The matter was argued before this Court on September 15, 1997. Though the record reflects that counsel for the Trust served a Notice of Hearing (Docket No. 30035) on counsel for Ms. Nelson, Ms. Wiltshire, and the lawyers for four other Dalkon Shield claimants, only counsel for Ms. Nelson appeared at the September 15 hearing.
After consideration of the briefs and arguments of the parties, the Court will grant the Motion to Interpret and take this opportunity to interpret and implement the Robins Plan of Reorganization (the "Plan") on this issue. Accordingly, for the reasons which follow, the Court holds that claimants are not entitled to prejudgment interest on their Dalkon Shield personal injury claims under the Plan.
I. BACKGROUND
Ms. Nelson chose to resolve her claim under Option 3 of the Claims Resolution Facility ("CRF").[1] Rejecting the Trust's offers of compensation, she elected to adjudicate her claim through litigation under § E.5(b) of the CRF. In September 1994, a jury in the United States District Court for the District of New Hampshire returned a verdict in Ms. Nelson's favor for $35,000 in compensatory damages. The judgment entered on that October 3, 1994 verdict awarded Ms. Nelson that sum "plus prejudgment interest pursuant to N.H.R.S.A. 524:1-B, if appropriate . . .," at an annual rate of 5.69%. In her Motion to Interpret, Ms. Nelson seeks prejudgment interest of $21,082.
Ms. Wiltshire similarly chose Option 3 to pursue her Dalkon Shield claim and litigation under CRF § E.5(b) to liquidate it. After trial in the United States District Court for the District of Massachusetts, the jury awarded Ms. Wiltshire $75,000 in actual damages. On July 11, 1997, judgment was entered for Ms. Wiltshire in that amount plus prejudgment interest under Massachusetts law for $156,427.32 "if allowable."
The Trust reports in its Response to Ms. Nelson's Motion to Interpret that before any cases reached arbitration or trial under the CRF, the Trustees determined that prejudgment interest was not allowable under the Plan on Dalkon Shield claims, based upon language in various parts of the Plan and the Disclosure Statement accompanying the Plan, the CRF, general bankruptcy law concepts and the Plan's goal of treating all claimants uniformly. The Trust further states that it has not paid prejudgment interest to any claimant, whether they resolved their claims through the voluntary settlement steps of Option 1, Option 2 and Option 3 of the CRF, the Alternative Dispute Resolution Program erected by the Trust pursuant to CRF § E.4, arbitration, or trial.
The Trust's refusal to pay prejudgment interest led to the filing of Ms. Nelson's Motion to Interpret and prompted Ms. Wiltshire to file her supporting Memorandum. Both Ms. Nelson and Ms. Wiltshire present the specific question of whether prejudgment interest must be paid to plaintiffs who prevail in litigation under CRF § E.5(b) when their applicable state law would allow prejudgment interest on personal injury damages.
In its Response, the Trust has broadened the question by asking the Court to rule that claimants cannot recover prejudgment interest on Dalkon Shield claims liquidated in either arbitration or trial. Apparently, prejudgment interest has never been an issue in the ADR program, where damages were limited to a maximum of $20,000 per claim and no one state's law provided the rule of decision. Nonetheless, the ruling by this Court announced today that claimants whose Dalkon Shield claims were unliquidated when Robins commenced its bankruptcy case are not entitled to prejudgment interest, regardless of what their state law might provide, applies equally to claims adjudicated in ADR, arbitration, or trial. The Court thus intends to put this issue to rest for all claims.
*178 II. ANALYSIS
A. The Court's Jurisdiction
The allowability of prejudgment interest on Dalkon Shield personal injury claims under the Plan presents a matter requiring interpretation of the Plan and its related documents. The Trust also submits that the prejudgment interest issue should be resolved in a manner that best serves the Plan's goal of uniformity of treatment of claimants. These tasks are within the exclusive jurisdiction of this Court to interpret the Plan and facilitate its implementation, retained in § 8.05(c) and § 8.05(d) of the Plan and paragraph 45 of the July 26, 1988 Order of this Court confirming the Plan. In re A.H. Robins Co., 88 B.R. 742 (E.D.Va.1988), aff'd, 880 F.2d 694 (4th Cir.), cert. denied, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); see also In re A.H. Robins Co. (Order Limiting Attorneys Fees), 182 B.R. 128 (Bankr.E.D.Va.1995), aff'd, In re A.H. Robins Co. (Bergstrom v. Dalkon Shield Claimants Trust), 86 F.3d 364 (4th Cir.), cert. denied, ___ U.S. ___, 117 S.Ct. 483, 136 L.Ed.2d 377 (1996); In re A.H. Robins Co. (Amended Administrative Order No. 1), Case No. 85-01307-R, Docket No. 11500 (E.D.Va. nunc pro tunc June 26, 1991), aff'd, 42 F.3d 870 (4th Cir.1994); In re A.H. Robins Co. (Dalkon Shield Claimants Trust v. Reiser), 972 F.2d 77 (4th Cir.1992). No party has questioned the Court's jurisdiction to resolve this issue.
B. The Robins Plan Does Not Allow Prejudgment Interest on Dalkon Shield Personal Injury Claims
1. The Appropriate Analytical Framework for this Issue
Ms. Nelson and Ms. Wiltshire seek payment of prejudgment interest accruing on their personal injury damages before they were liquidated in the judgments entered in their lawsuits, contending that the Plan and CRF should be interpreted as reserving to them all remedies or rights to payment normally available to them under their state's tort law. A ruling granting them that entitlement would benefit those two claimants, those other claimants who have prevailed or will prevail at trial in cases governed by the law of a state that allows recovery of prejudgment interest on personal injury damages, and those who secured or will in the future receive awards in arbitration under CRF § E.5(a), where the applicable Virginia law recognizes a claim for such interest. See Va.Code Ann. 8.01-382; Arbitration Rule 33. As to claims in ADR, if the Plan question were answered in the affirmative, the Court would also have to assess whether such a state law remedy could exist in that specialized, streamlined procedure  an outcome that strikes the Court as unlikely. According to the Trust's Response, some thirty-one states permit recovery of prejudgment interest on personal injury damages. A reading of the Plan as giving a right to prejudgment interest thus would benefit only the small fraction of Dalkon Shield claimants who rejected the Trust's offers and concluded their claims in arbitration or through litigation under the law of a state that would allow prejudgment interest in such cases.
In the proceedings before this Court on the recently entered Administrative Order No. 2, the Trust submitted evidence showing that over ninety-seven percent of all Dalkon Shield claims before the Trust have been resolved by voluntary agreement.[2] Thus, 185,306 Trust claimants and 26,867 Breland Insurance Trust claimants have signed releases waiving any claim to prejudgment interest. Counting Trust and Breland Trust claimants, thirteen claimants had recovered awards in arbitration. Twenty-one Trust claimants won judgments in litigation. Only twenty-three arbitration and sixty-one litigation cases were left to be decided. Though a seemingly universal issue at first blush, the preservation in the Plan of state law claims to prejudgment interest would bestow this entitlement upon less than a fraction of one percent of all Dalkon Shield claimants.
The analysis of the recoverability of prejudgment interest on Dalkon Shield claims both starts and ends with the Plan and its related documents. After its confirmation by *179 this Court and the Court of Appeals for the Fourth Circuit, the Plan was consummated when the Trust was fully funded on December 15, 1989. The product of extensive negotiations and litigation among the competing interests involved in the Robins bankruptcy case, including the Dalkon Shield Claimants' Committee, the Plan is the contract between Robins and its creditors that defines both the rights of Dalkon Shield claimants and the duties of the Trust and its five Trustees.
In a reorganization under Chapter 11 of the Bankruptcy Code, a debtor's creditors often contract away in the reorganization plan rights that their state law would otherwise have given them, in order to secure payments from the reorganized debtor that equal or exceed the amounts those creditors would otherwise receive if a debtor were forced to liquidate to pay their claims. The Bankruptcy Code permits and encourages holders of claims to reach a negotiated settlement of their respective positions under a plan of reorganization and allows the court to confirm a negotiated plan. 5 Collier on Bankruptcy § 1125.03 (15th ed.1996).
The provisions of the confirmed plan resulting from that process bind the debtor and all its creditors. 11 U.S.C. § 1141(a). The plan is res judicata as to all questions that could have been raised relating to it, even if it contains provisions arguably contrary to applicable law. See Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938); In re Varat Enterprises, Inc., 81 F.3d 1310 (4th Cir.1996); In re Chattanooga Wholesale Antiques, Inc., 930 F.2d 458 (6th Cir.1991). Any preconfirmation rights of creditors survive only to the extent allowed in the reorganization plan. In re Circle K Corp., 198 B.R. 784 (Bankr.D.Ariz.1996); In re Poplar Run Five Ltd. Partnership, 192 B.R. 848 (Bankr.E.D.Va.1995); In re Bowen, 174 B.R. 840 (Bankr.S.D.Ga.1994); In re Grimm, 168 B.R. 102 (Bankr.E.D.Va.1994); In re Henderberg, 108 B.R. 407 (Bankr. N.D.N.Y.1989); 5 Collier on Bankruptcy § 1141.01[1] (15th ed.1996). "Once a plan is confirmed, neither a debtor nor a creditor can assert rights that are inconsistent with its provisions." In re Varat Enterprises, Inc., 81 F.3d at 1317. The Plan thus controls whether any Dalkon Shield claimants remained entitled after its confirmation to prejudgment interest on their claims and whether the Trustees are required to pay it.
This Court presided over the evolution of the Plan in 1988, as well as the proceedings relating to the five failed plans that came before it. Facing thousands of claims and the gargantuan task of corralling them in one location, determining the total funds needed to process and pay them, and then designing the procedures to do so, the Court confirmed the Plan over the objections of those who decried as inadequate the $2.475 billion the Court estimated as sufficient to satisfy all valid Dalkon Shield claims.[3] Formed in that crucible, the Court is satisfied that the Plan neither created nor guaranteed rights to payment through silence or omission. The absence of a clear entitlement in the Plan to a particular monetary benefit leads to the presumption that the writers of the Plan did not intend to bestow it upon claimants. The burden thus is on the claimants seeking to locate a financial remedy in the Plan to convince the Court it both can and must be found there.
This method for assessing whether any one claimant or a group of claimants enjoys a monetary entitlement under the Plan is one legacy of its arduous evolution. It springs as well from the unique nature of this attempt to satisfy fairly all existing claims out of a common, limited fund. This is not the normal bankruptcy case where denying a benefit to a creditor under a plan confers a corresponding financial gain upon the reorganized debtor. Under § G.14 of the CRF, all residual funds in the Trust must be paid on a pro rata basis to claimants who recovered on their claims more than the $725 de minimis amount set by the Trustees as the threshold for pro rata eligibility. No funds can ever revert to the debtor, Robins, either in its original form or in its present incarnation as a subsidiary of American Home Products Corporation. Nor does any ruling denying a *180 payment to claimants accrue to the benefit of the Trust or its Trustees. Rather, all funds saved by the Trust through any means, whether by a reduction of administrative expenses, the Trust's successful defense of a claim in arbitration or litigation, or as a result of a ruling from this Court denying a claimant's request for some payment, ultimately serve the interests of the universe of eligible Dalkon Shield claimants by augmenting their § G.14 pro rata distribution.
As a result, in proceedings such as this one involving the Plan, the Court is not tasked with weighing the equities between creditors and the debtor, or between claimants and the Trust's own interests, but instead from one claimant to another. The contest here is between a small subset of claimants and the Trust as the representative of the entire eligible claimant population. In this unique context, it is entirely appropriate to place upon the movants the burden of establishing their entitlement to a monetary benefit that, if allowed, would aid only a few claimants to the financial detriment of other claimants.
2. The Disclosure Statement Forecast that Prejudgment Interest Would not be Paid on Unliquidated Claims
No section of the Plan or CRF expressly allowed recovery of prejudgment interest on Dalkon Shield claims. Nor did any one provision of the Plan or CRF expressly disallow prejudgment interest on such claims, using those words. The language in the Plan and the Disclosure Statement that accompanied it, however, lead the Court to conclude that the various parties involved in the writing of the Plan and the claimants who voted overwhelmingly in 1988 to approve it neither expected nor intended that claimants would retain a right to prejudgment interest from the Trust on their unliquidated claims for personal injury damages.
Pursuant to § 1125 of the Bankruptcy Code, 11 U.S.C. § 1125, after notice and hearing on March 21, 1988, this Court approved the Disclosure Statement describing the Plan as containing adequate information to apprise Robins' creditors of the facts to permit claimants to make an informed judgment about the Plan. Robins sent copies of the Disclosure Statement, including the Plan and all of its attachments, to all claimants who held Dalkon Shield personal injury claims, defined in § 3.03 of the Plan as Class 3A Claims. (PLN-8). Over 140,000 Dalkon Shield claimants, representing approximately 72% of the total class, cast their votes in response to this mailing. Of those who voted, 94.38% voted to accept the Plan. See In re A.H. Robins Co., 88 B.R. at 750.
A § 1125 disclosure statement accompanying a plan of reorganization is designed to provide information to creditors to permit them to determine whether to vote for or against the plan. Creditors form their ideas about what they will receive out of the debtor's estate from that disclosure statement. It plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can make their own decisions on the plan's acceptability. See In re Rook Broadcasting of Idaho, Inc., 154 B.R. 970 (Bankr.D.Idaho 1993); In re Ferretti, 128 B.R. 16 (Bankr. D.N.H.1991); 5 Collier on Bankruptcy § 1125.03 (15th ed.1996).
The Robins Disclosure Statement evidenced the clear intention that the only Dalkon Shield claimants who would receive interest on their claims were those who held claims defined in § 1.39 of the Plan as Dalkon Shield Liquidated Claims, i.e., persons with valid settlement agreements or who had won final lawsuits against Robins before Robins filed its Chapter 11 petition on August 21, 1985, while persons with unliquidated Dalkon Shield Personal Injury Claims would not be entitled to receive interest. The Disclosure Statement began with an eight-page "SPECIAL NOTE TO WOMEN WHO USED THE DALKON SHIELD: HOW YOUR DALKON SHIELD CLAIMS WILL BE TREATED." Under a section entitled "Key Elements of the Plan," the Disclosure Statement advised persons with Liquidated Claims:
4. If your claim was settled, but not paid, before Robins filed for bankruptcy or if you won a final judgment against Robins which was not paid before the bankruptcy *181 and no appeal from the judgment remains undecided, the Claimants Trust will pay you the amount of the settlement or judgment as soon as possible, plus interest from January 1, 1988.
(Disclosure Statement at 1). As for unliquidated personal injury claims, the Disclosure Statement advised:
5. If your claim was not paid, settled or decided by a Court before the bankruptcy, the Claimants Trust will evaluate it under certain rules. The rules, contained in the Claims Resolution Facility (CRF) portion of the Plan, are designed to encourage the prompt and fair payment of claims without going to court. However, if you are unhappy with the settlement offered you by the Claimants Trust, you may have your claim decided by a court.
(Disclosure Statement at 2). More specifically, under the heading "How Valid Dalkon Shield Claims Will Be Paid," the Disclosure Statement warned:
As noted above, payments to Dalkon Shield users and their families will be made only out of the Claimants Trust. Some claimants, whose claims have already been determined, will be paid right after the Plan goes into effect. These claimants are in two groups. First, people who had a valid settlement agreement with Robins before August 21, 1985, when Robins' bankruptcy case began, will be paid the amount of their settlement right away. Second, people who had won final lawsuits against Robins before August 21, 1985, will be paid right away. If Robins appealed a case, however, and if all the appeals or other court proceedings are not over, those people will be paid as soon as their case is over, unless their judgment is overturned. Those of you with the settlements or judgments described above will also be paid interest from January 1, 1988. This interest will be at the rate set by a major bank as its "reference rate," plus one quarter of one percent. People who do not now have settlements or judgments from before August 21, 1985 will not receive interest.

(Disclosure Statement at 4) (emphasis added). The matter was addressed again in a later section entitled "When You Will Receive Payment on Your Claim":
If you settled your Dalkon Shield claim or won a final judgment against Robins before August 21, 1985, for which there was no appeal pending, you will be paid in full promptly after the plan goes into effect if you filed a proper Claim in this case. Your Claim is referred to in the Plan as a "Dalkon Shield Liquidated Claim." ALLOWED DALKON SHIELD LIQUIDATED CLAIMS WILL BE PAID IN FULL, WITH INTEREST FROM JANUARY 1, 1988, PROMPTLY AFTER THE PLAN GOES INTO EFFECT.
If you have not settled your Dalkon Shield claim or won a final judgment against Robins, then you may choose one of the four options for processing your claim under the CRF procedure. The CRF procedure was designed for the speedy and fair resolution of your claim.
(Disclosure Statement at 7).
The entitlement of holders of liquidated claims to interest was confirmed at pages 39 and 47 of the Disclosure Statement. At no point in the Disclosure Statement was there any suggestion that holders of unliquidated claims would have a right to interest on their damages before they became allowed, liquidated claims. Gauged from the Disclosure Statement, holders of Liquidated Claims were to be paid interest on their claim amounts until paid in full, while those with unliquidated claims for personal injury damages, such as Ms. Nelson and Ms. Wiltshire, would not.
3. The Provisions of the Plan and its Related Documents
The Plan implemented that intention. Under § 4.03, Allowed Claims in Class 4  the Dalkon Shield Liquidated Claims  were to be paid the amount of the claim, plus interest accrued at the financing rate set in § 1.55 of the Plan, from January 1, 1988, to the date of payment. (PLN-8). Section 1.55 of the Plan fixed the financing rate as the rate of interest equal to the reference rate of Manufacturers Hanover Trust Company, plus one-quarter of one percent. (PLN-5).
*182 Dalkon Shield Personal Injury Claims  those held by persons like Ms. Nelson who had not liquidated their claims by settlement agreement or judgment before August 21, 1985  were defined by § 3.03 of the Plan as Class 3A Claims. (PLN-8). Such unliquidated personal injury claims would not be payable until they became "Allowed Dalkon Shield Personal Injury Claims" by following the steps of the CRF. Section 5.01 of the Plan placed upon the Trust responsibility "for making payments on account of Dalkon Shield Personal Injury Claims that become Allowed Dalkon Shield Personal Injury Claims under the conditions set forth" in the Claimants Trust Agreement ("CTR"). Section 2.02 of the CTR directed the Trust to "satisfy as fully, fairly and expeditiously as practicable, all Dalkon Shield Personal Injury Claims" and to "satisfy any such claims as and to the extent provided in Article V of this Agreement and in the Claims Resolution Facility." (CTR-1). Section 2.02(ii) of the CTR required the Trust to "conserve and protect the Trust estate so as to enable the Trustees to satisfy as fully as possible all claims assumed by the Trust in accordance with the terms of the Plan and this Agreement," with "fair and efficient resolution of claims to be preferred over all else." (CTR-1-2).
Article V of the CTR defined how the Trust was to make distributions on claims. Section 5.01(a) of the CTR required the Trustees to distribute to each holder of an Allowed Dalkon Shield Personal Injury Claim "such amount as may be determined in accordance with Section 5.02 of this Agreement and the Claims Resolution Facility." (CTR-8). Section 5.02(a) mandated that a Dalkon Shield Personal Injury Claim "shall be assessed and paid by the Trust as provided under the Claims Resolution Facility." (CTR-9).
The Court must resort to the CRF to determine the rights to payment bestowed upon holders of unliquidated Dalkon Shield claims. Section A of the CRF directed the Trust to provide "fair and equitable compensation based upon historic values, updated by current developments, to persons injured by the Dalkon Shield." Section C instructed the Trustees to develop Option 1 as a "short form" claim procedure "permitting claimants who elect to do so to receive payments upon a minimal showing of Dalkon Shield use and injury." (CRF-1). Section D described Option 2 as a procedure that permitted claimants "to receive a specified payment in accordance with a schedule" setting settlement amounts for each of the injuries listed on Exhibit A to the CRF. Section D allowed the Trustees to prepare a schedule that "varies the award for the same injuries according to type and volume of the documentation the claimant submits." (CRF-2). Neither of these sections of the CRF directed the Trustees to include prejudgment interest in their calculations of the fixed amounts available to claimants under Option 1 and Option 2. The Trustees set the Option 1 payment at $725 for users and $300 for non-users. The Option 2 schedule for the injury categories listed in CRF Exhibit A ranged from $125 to a high of $5,500, depending upon the injury shown. The Trust reports that no prejudgment interest was included in those figures.
Ms. Nelson and Ms. Wiltshire chose to resolve their claims under the full evaluation procedure available under Option 3, which was described in § E of the CRF. Section E.2 of the CRF instructed the Trustees to pay Option 3 claims in
an amount, if any, at which the comparison of the claimant's profile with historical profiles suggest that the claim should be allowed, taking into account the quantum and quality of the evidence supporting the claim, absence of in-depth scrutiny or discovery, the waiver by the Trust of defenses based upon the statute of limitations not evident from the face of the documents supplied or the face of the information form, lack of necessity of presentation of other evidence necessary under Option 3, other particularities that distinguish the pending claims from ones previously resolved, and any other factors the Trustees deem relevant.
(CRF-2). This section created no requirement that the Trustees consider prejudgment interest as a factor in paying Option 3 claims. The Court finds no suggestion elsewhere in the CRF that claims adjudicated *183 through ADR, arbitration or trial would include a right to prejudgment interest under any state law.[4]
Ms. Wiltshire points to no Plan or CRF provisions that support her claim for prejudgment interest. Ms. Nelson cites the language in CRF § E.5(b) that "[a]ll claims and defenses shall be available to both sides in a trial" and § G.11, which provides that the "law to be applied to the settlement or trial of claims shall be the law that is or would have been applicable notwithstanding the pendency of the chapter 11 case." (CRF-4, 6). She contends that these sections mean that she "would have been entitled to all of the remedies which would have been available to her as if the Chapter 11 case had never been filed unless those remedies were somehow otherwise restricted by either the CRF or the amended Administrative Order Number One." (Motion at 3, ¶ 22).
Neither § E.5(b) nor § G.11 can be read to create or preserve an entitlement to prejudgment interest for claimants in the Plan, given that the Plan and the CRF do not direct the Trust to pay prejudgment interest and the Disclosure Statement contained the clear warning that no such interest would be paid. The language in § E.5(b) concerned the relative positions of the claimants and the Trust in a trial, as compared to the arbitration procedure described in § E.5(a). With § A of the CRF directing that settlement is to be preferred over arbitration and trial, the CRF was designed to create incentives for the resolution of claims by voluntary agreement by tilting the field in favor of claimants in the Option 1, Option 2, and the offer and evaluation stages of Option 3. See In re A.H. Robins Co. (In re Administrative Order No. 2), 215 B.R. 112 (E.D.Va.1997); In re A.H. Robins Co., Case No. 85-01307-R, Docket No. 11500 (E.D. Va. nunc pro tunc June 26, 1991), affirmed, 42 F.3d 870 (4th Cir.1994). The field continued to be uneven in arbitration because § E.5(b) allowed the Trust to assert in arbitration "all available defenses . . . other than absence of product defect." (CRF 3). To discourage claimants from the more lengthy and expensive trial process, § E.5(b) warned that all claims and defenses were available to both sides at a trial, thereby distinguishing trial from arbitration.
That was the purpose of § E.5(b). It did not entitle claimants to all state law remedies or payments not otherwise provided in the Plan or CRF. It did not restore to claimants rights that the Plan and CRF expressly or constructively eliminated. With the Disclosure Statement reflecting the clear intention of the parties that there be no entitlement to interest on unliquidated claims, § E.5(b) cannot be interpreted to convey an interest entitlement without specifically mentioning it, any more than it could be read as restoring a right to punitive damages otherwise available under state law when such damages were expressly disallowed by § 7.02(a)(iv).
Nor can § G.11 be read as preserving an entitlement to prejudgment interest. The Court agrees with the Trust that § G.11 was inserted in the Plan in the aftermath of this Court's Order directing that all personal injury claims be transferred to the Eastern District for all purposes, which had been sustained by the Court of Appeals for the Fourth Circuit in A.H. Robins v. Piccinin, 788 F.2d 994 (4th Cir.), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). Section E.5(b) stated that venue would be "unchanged by the Chapter 11 case," and *184 § G.11 allowed that the law applied to settlement and trial shall be the law that otherwise would have applied without the pendency of the Chapter 11 case to assure plaintiffs that they could have trials in their home states, if venue were otherwise appropriate, on the products liability causes of action available to them under their state's law. These provisions meant that claimants would not face transfer of their cases to Virginia and Virginia choice of law rules that could have resulted in the application of substantive law to the claims other than the law of their home states.
Section G.11 did not, and could not, mean that those cases would be tried in those states as if the Robins bankruptcy case had never existed. Each trial of a Dalkon Shield claim is affected by the provisions of the Plan and CRF, Amended Administrative Order No. 1, and the many rulings of this Court since the Plan was consummated that affect the procedures applicable to Dalkon Shield claims. These provisions and Orders regularize to the greatest extent possible the treatment of claims under the Plan, even for those claimants who want a trial. They are not erased by § G.11, as Ms. Nelson herself appears to recognize in her Motion by conceding that § G.11 is subject to Amended Administrative Order No. 1. The provisions of that Order limited discovery rights that claimants might otherwise have had under their state laws. It has never been thought that § G.11 preserved those discovery rights as unalterable. Nor can it be read as preserving a state law prejudgment interest claim as sacrosanct, in the face of the Disclosure Statement, Plan, and CRF provisions showing an intent that interest not be paid on unliquidated personal injury claims.
In his closing argument to this Court on November 11, 1987, at the conclusion of the evidentiary hearing on the estimation of the funds needed to pay all Dalkon Shield claims, counsel for the Dalkon Shield Claimants' Committee described prejudgment interest on the claims as one of the "add ons" that elevated his prediction of the required funds to $4 billion to $7 billion. (Hearing Tr. at 2456-57). The Court suggested then that rewarding only some claimants prejudgment interest and not others, depending upon the state in which they lived, seemed contrary to the bankruptcy goal of treating all claimants uniformly. Id. at 2456. After that hearing, this Court announced that $2.475 billion paid over a reasonable period of time would be sufficient to satisfy all valid claims. The Plan was then approved by the claimants and confirmed by this Court with $2.23 billion to be placed in the Trust, and with a Disclosure Statement and Plan provisions calling for interest only on liquidated claims and no interest on unliquidated claims. That sequence of events confirms the intention the Court finds today in the Plan.
C. The Disallowance of Prejudgment Interest in the Plan Comports with General Bankruptcy Law
Because the Plan controls the rights of Dalkon Shield claimants and the obligations of the Trust and its Trustees, there may be need to address how claimants would fare on this issue in the absence of the Plan. Nonetheless, the context in which the Plan was formed and currently operates provides further insight as to the drafters' intentions, for the disallowance of interest on unliquidated claims in bankruptcy finds support elsewhere in the law.
Section 502(b) of the Bankruptcy Code provides that a claim may be allowed as payable out of a bankruptcy estate in an amount determined as of the date of the filing of the bankruptcy petition, except to the extent that "such claim is for unmatured interest." This section erects the "general rule . . . that interest stops accruing when the bankruptcy petition is filed." Ford Motor Credit Company v. Dobbins, 35 F.3d 860, 869 (4th Cir.1994).
The Supreme Court considered the issue of prejudgment interest in bankruptcy in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), where it held that in a reorganization case under the former Bankruptcy Act, the holders of bonds issued by the debtor were not entitled to recover prejudgment interest on a claim for interest that had fallen due on the bonds but had not been paid by the debtor. The purpose of a bankruptcy, *185 said the Court, "is so to administer an estate as to bring about a ratable distribution of assets among the bankrupt's creditors." 329 U.S. at 161, 67 S.Ct. at 239. Even if interest were payable under the laws of states involved in the transaction, the Court concluded it would still have to decide whether allowance of such interest would comport with the policy of the Bankruptcy Act:
In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits. . . . [B]ankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles. . . . When and under what circumstance federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by federal law. . . . The general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of proceedings.
329 U.S. at 162-63, 67 S.Ct. at 240.
The Vanston Court characterized interest on debts as a penalty imposed because of a delay in payment that should not be inflicted upon the debtor where the delay in payment was necessitated by law in order "properly to preserve and protect the estate for the benefit of all interests involved." 329 U.S. at 163, 67 S.Ct. at 240. Since the delay in payment "is the act of the law" as a "necessary incident to the settlement of the estate," the Court found that it would be inequitable for anyone to gain an advantage or to suffer a loss because of it. Id.
The Court was also persuaded that disallowance of interest postpetition would avoid the administrative inconvenience of continuously recomputing interest, causing recomputation of claims, as well as the inequity of creditors being treated differently because their claims bore diverse interest rates or were paid on different dates by the bankruptcy courts. The "touchstone of each decision on allowance in bankruptcy," said the Court, "has been a balance of equities between creditor and creditors or between creditors and the debtor." 329 U.S. at 165, 67 S.Ct. at 241. Delay in payment of the creditor's claim resulting from an order of the court or the Bankruptcy Code in order to preserve and protect the debtor's estate "pending a ratable distribution among all the creditors according to their interests as of the date the receivership began" meant that imposition of interest after the filing of the bankruptcy was inequitable. 329 U.S. at 166, 67 S.Ct. at 242.
The Vanston Court held that creditors could not recover prejudgment interest postpetition, i.e., after the debtor files for bankruptcy. The equitable powers of the court and the concern for equal treatment of creditors also can prompt the disallowance of prepetition, as well as postpetition, interest. In Smith v. Robinson, 343 F.2d 793 (4th Cir.1965), an officer and director of the debtor corporation filed claims against the trustee in the reorganization proceedings alleging that his company was indebted to him and sought interest on those claims. The Court of Appeals for the Fourth Circuit approved the lower court's disallowance of these interest claims, noting that it was "well settled that a creditor will not be allowed interest from the date of filing of a petition in bankruptcy until the claim is paid." 343 F.2d at 800. The Court also held that a bankruptcy court, in the exercise of its sound discretion, could deny prepetition as well as postpetition interest, because such a court sits as a court of equity and is to apply equitable considerations. "In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate." 343 F.2d at 801 (quoting Pepper v. Litton, 308 U.S. 295, 307-308, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939)).
The essential purpose of a bankruptcy is the ratable distribution of assets among the bankrupt's creditors in a fair and equal manner, regardless of otherwise applicable state law, as Vanston prescribed. See Ford Motor Credit Company v. Dobbins, 35 F.3d at 865 ("[the] presumption in bankruptcy *186 cases is that the debtor's limited resources will be equally distributed among the creditors"). In its opinion confirming the Plan, this Court noted that one of the goals of the channeling provisions of the Plan was the "equality of distribution to Dalkon Shield Personal Injury Claimants." In re A.H. Robins Co., 88 B.R. 742, 753 (E.D.Va.1988). The Court also saw as a significant objective the "systematic evaluation and payment of Dalkon Shield claims in an orderly, fair manner, applying the same rules to all." Id. In In re A.H. Robins Co. (Dalkon Shield Claimants Trust v. Reiser), 972 F.2d 77 (4th Cir. 1992), the Court of Appeals for the Fourth Circuit, addressing the definition of Unreleased Claim in § 1.85 of the Plan, held that this Court has broad equity powers to stay suits against physicians because of the "interests in preserving the assets of the Trust and in promoting equitable recovery by all injured Dalkon Shield users." 972 F.2d at 82. The Court also noted that the "core purpose of the Trust" was "to uniformly compensate all Dalkon Shield injuries." Id.
These concerns for equality of treatment among creditors explain the Plan's elimination of prejudgment interest on unliquidated Dalkon Shield Personal Injury Claims. Allowance of prejudgment interest in the thirty-one states that permit its recovery would favor claimants in those states over claimants who live in other areas. Among the states allowing prejudgment interest, the accrual dates and interest rates differ profoundly. Claims go to arbitration or trial at different times, varying by as much as several years, meaning that the amounts fixed as interest would similarly differ among claimants. Some claimants would recover prejudgment interest; most would not. Some would get interest payments greater than their judgments, while others would receive very little, depending upon their state's accrual dates and applicable interest rates.
These inequities in the treatment of creditors in the same class under the Plan were avoided by not providing for prejudgment interest for any claimants who did not already have a fixed, liquidated claim when Robins filed for bankruptcy on August 21, 1985. The fair and efficient compensation sought by the CRF has been best served by eliminating from the calculus of Dalkon Shield payments and judgments these differing and confusing rules on prejudgment interest.
Ms. Nelson correctly notes that perfect uniformity cannot be achieved for claimants who go through trial. Procedural and evidentiary rules vary from state to state and from state to federal courts; juries will offer differing amounts as damages; some claimants will be barred by limitations and others not; some claimants will prevail, while others do not. Nonetheless, the Plan and CRF, as well as the Orders of this Court throughout the bankruptcy case, have attempted to treat the universe of claimants similarly and fairly to the greatest extent possible. A reading of the Plan as disallowing prejudgment interest, an entitlement that would be enjoyed by some and not others, is an appropriate step towards uniformity and represents an instance where uniform treatment can be achieved according to the language of the Plan and CRF, despite the lack of perfection in that regard for claims that enter trial under § E.5(b).
Nor can any plaintiff legitimately feel shortchanged by not being able to recover prejudgment interest from the Trust. The availability of excess funds in the Trust has permitted pro rata payments to all claimants who resolved their claims for more than $725. The Trust already has paid those eligible claimants pro rata distributions equal to eighty-five percent of their original awards and expects the pro rata eventually will amount to 100 percent of those original recoveries. Ms. Nelson and Ms. Wiltshire thus will receive twice what their juries assessed to be their actual damages. The denial of prejudgment interest in addition to that double recovery could hardly be said to lead to defeated expectations. Indeed, the pro rata method of distributing the residual funds in the Trust allows all deserving claimants to share uniformly in them, rather than rewarding greater shares to claimants who happen to live in states that permit prejudgment interest on personal injury damages.
It is this balancing of the equities among claimants that leads the Court to conclude *187 that no prejudgment interest should be paid on Dalkon Shield claims, even if the Disclosure Statement, the Plan, and the CRF left the issue in greater doubt than they did. The ratable distribution of the funds in the Trust will best be achieved by refusing to award prejudgment interest to a small number of claimants, whether accruing before or after Robins filed its chapter 11 proceeding in August 1985, and instead leaving those funds in the Trust to be distributed on a pro rata basis to all the pro rata eligible claimants under CRF § G.14.
This unique circumstance warrants the exercise of the Court's discretion to deny prejudgment interest. It also distinguishes this situation from the one potentially applicable exception to the general § 502 tolling of interest postpetition  where the debtor proves to be solvent. See In re Twin Parks Ltd. Partnership, 720 F.2d 1374 (4th Cir. 1983). That exception prevents a solvent debtor from retaining postpetition interest it can afford to pay. Here, as already noted, no funds can ever revert to Robins, while all monies in the Trust will flow on a uniform basis to all the deserving claimants. The equitable powers of the Court and its authority and duty to facilitate the implementation of the Plan's goal of fair treatment would call for the disallowance of prejudgment interest under the Plan, even without guidance on the drafters' intentions, where the Plan did not expressly require the Trust to pay it.
III. CONCLUSION
For these reasons, the Court concludes that prejudgment interest is not recoverable on Dalkon Shield claims that were unliquidated when Robins began its bankruptcy case on August 1, 1985.
NOTES
[1] Included as Exhibit C to the Plan, the CRF set out the basic procedures for the Trust's processing of the over 400,000 claims relating to the Dalkon Shield asserted at one time or another during the Robins bankruptcy case.
[2] This information is shown in Exhibits 6-8 filed by the Trust at the October 21, 1997 hearing on that Motion, and was as of either October 17 or October 20, 1997.
[3] At the November 5-11, 1987 estimation hearings, the Dalkon Shield Claimants' Committee contended that $4.2 billion to $7.0 billion would be needed to pay all valid Dalkon Shield claims.
[4] The Trust stated in its Response that the Trustees, though paying no prejudgment interest, did adopt a policy under which the Trust has paid postjudgment interest. Claimants who have recovered judgments in arbitration or trial under the CRF that went unpaid for a period of time because of appeals or the holdback policy on payment of judgments originally in effect under paragraph 13 of Amended Administrative Order No. 1 have been paid postjudgment interest after their claims were liquidated, using the federal postjudgment rate set by 28 U.S.C. § 1961. The Special Note at page 4 of the Disclosure Statement distinguished postjudgment interest on personal injury claims once they became liquidated from the overall interest question. The Special Note portended the possibility that payment could be delayed after cases were liquidated through arbitration or litigation and warned claimants that they "might not be paid for this delay in the payment of [their] claim[s%" This left the postjudgment interest question to the discretion of the Trustees. The Trustees determined to pay postjudgment interest on such judgments after the claim had become due and payable upon its liquidation in the form of a judgment. This mirrored the Plan's treatment of postjudgment interest on Liquidated Claims.