**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: A. H. ROBINS COMPANY,
INCORPORATED,
Debtor.

CLAIRE NELSON; ROBERTA WILTSHIRE,
Claimants-Appellants,

v.

DALKON SHIELD CLAIMANTS TRUST,
Trust-Appellee.

No. 98-1080

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert R. Merhige, Jr., Senior District Judge;
Blackwell N. Shelley, Bankruptcy Judge.
(CA-85-1307-R)

Argued: June 4, 1998

Decided: August 31, 1998

Before WIDENER, HAMILTON, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Howard P. Blatchford, Jr., JAGER, SMITH &
STETLER, P.C., Boston, Massachusetts, for Appellants. Orran Lee

Brown, Sr., Richmond, Virginia, for Appellee. **ON BRIEF:** Bruce F. Smith, JAGER, SMITH & STETLER, P.C., Boston, Massachusetts, for Appellants.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The issue in this case is whether the approved plan of reorganization of the A. H. Robins Co., Inc. provides for the payment of pre-judgment interest to women who obtained judgments against the Dalkon Shield Claimants Trust after Robins filed its Chapter 11 bankruptcy petition on August 21, 1985. The district court held that pre-judgment interest is not authorized by the plan; we agree and now affirm.

I.

Claire Nelson and Roberta Wiltshire suffered personal injuries caused by use of the Dalkon Shield intrauterine birth control device sold by the debtor A. H. Robins Co. during the 1970s. Wiltshire filed suit against Robins in district court in Massachusetts on January 17, 1980, and Nelson in district court in New Hampshire on April 7, 1984. Neither case had proceeded to final judgment when Robins filed its petition for Chapter 11 reorganization on August 21, 1985.

On July 26, 1988, the district court confirmed Robins' Sixth Amended and Restated Plan of Reorganization ("Plan"). The Plan called for the creation and funding of the Dalkon Shield Claimants Trust, out of which all claims for damages against Robins resulting from use of the device would be paid. The Plan further established a Claims Resolution Facility ("CRF"). The goal of the CRF was to pay claims

as quickly and efficiently as possible, thus minimizing the expenses of both the Trust and the claimant.

Under the CRF, a claimant may recover up to $725 upon a minimal showing of Dalkon use and injury or up to $5,500 according to an injury-specific schedule of payments. Those who are dissatisfied with these amounts or who have suffered more severe injuries may choose arbitration or litigation against the Trust. Both Wiltshire and Nelson chose litigation.

Nelson's action went to trial in September 1994. The jury returned a verdict in her favor and awarded damages of $35,000. A 1997 trial of Wiltshire's claim resulted in a $75,000 verdict. In each case, the final judgment of the district court includes such prejudgment interest as may be permitted by law.[1]

In March 1997, Nelson filed a motion to interpret the Plan in the district court overseeing the Robins bankruptcy. She argued that the Plan required the payment of prejudgment interest where, as in her case, the state law applicable to the underlying tort action so required. Wiltshire filed a memorandum supporting Nelson's motion. Aside from the Plan, Wiltshire argued that general bankruptcy law permitted the award of prejudgment interest under the circumstances.

The Trust opposed Nelson's motion. After hearing oral argument, the district court ruled that prejudgment interest is not permitted by the Plan. In re A H. Robins Co. (Nelson v. Dalkon Shield Claimants Trust), 216 B.R. 175 (E.D. Va. 1997).

Nelson and Wiltshire appeal.

_____

[1] The law of both Massachusetts and New Hampshire provides for the award of prejudgment interest as a matter of course. See Mass. Gen. Laws ch. 231 § 6B; N. H. Rev. Stat. Ann. § 524:1-b.

II.

A.

The claimants can muster only meager support for their position in the text of the Plan. They rely primarily on two clauses in the CRF. Section E.5(b) states, "All claims and defenses shall be available to both sides in a trial[,]" while § G.11 provides, "The law to be applied to the settlement or trial of claims shall be the law that is or would have been applicable notwithstanding the pendency of the chapter 11 case[.]" In their view, these provisions preserve all remedies that would have been available to them in the absence of the Robins bankruptcy, except where specifically barred by the Plan.

The short answer to this argument is that the law applicable to the conduct of a trial, the availability of claims and defenses, or the negotiation of a settlement simply does not involve the enforceability of a judgment against a bankruptcy estate or the computation of interest on such a judgment.

The longer answer is supplied by the context of each provision. In order to encourage claimants to settle, the CRF relaxed claimants' burdens of proof and restricted the defenses available to the Trust. Those claimants who chose arbitration or trial faced progressively more vigorous defense. In arbitration, the Trust could assert any defense "other than absence of product defect." CRF § E.5(a). At a trial, no defensive holds were barred: the Trust could, if it so desired, even contest the defectiveness of the Dalkon Shield itself. In this context, it is plain that § E.5(b) was not intended to bestow some sort of bonus right to prejudgment interest for claimants who went to trial, prevailed, and were fortunate enough to live in a state that allowed such interest. Had it done so, § E.5(b) might <u>encourage</u> litigation, which is contrary to the express intent of the CRF. **2**

_____

**2** Section A of the CRF states, in part,

> The purpose of this facility is to provide all persons full payment of valid claims at the earliest possible time consistent with the efficient design and implementation of the [CRF]. This purpose is to be achieved by (1) providing an efficient economic mechanism for liquidating claims which favors settlement over arbitration and litigation, thereby reducing transaction costs[.]

The claimants fare no better under CRF § G.11. In that clause, the debtor and creditors agreed to undo a prior order of the district court. This order directed that all personal injury claims against Robins be transferred to the Eastern District of Virginia for all purposes, and we affirmed it as a proper exercise of the court's power under 28 U.S.C. § 157(b)(5). A. H. Robins Co. v. Piccinin , 788 F.2d 994, 1009-1014 (4th Cir.), cert. denied, 479 U.S. 876 (1986). Section G.11 assured claimants of a local trial using local rules, just as Nelson and Wiltshire received. It did not, however, exempt judgments obtained at trial from the effects of the Robins bankruptcy. The entering of such a judgment simply creates a liquidated claim to be paid according to the terms of the Plan.

B.

In the alternative, the claimants rely not on the Plan's words, but on its silence. They point out that the Plan expressly prohibits the payment of punitive damages by the Trust.[3]  Therefore, they assert, "[b]y omitting any exclusion in the CRF for pre-judgment interest, the drafters chose to permit the recovery of pre-judgment interest by claimants in those states that allowed for its recovery. Expressio unius est ex[c]lusio alterius." Brief of Appellants, at 10. We are unpersuaded.

The pitfalls of overreliance on expressio unius est exclusio alterius are well known.[4] Director, Office of Workers' Compensation Programs v. Bethlehem Mines Corp., 669 F.2d 187, 197 (4th Cir. 1982) (maxim is "unreliable" and should be "applied with great caution"). "The problem with expressio unius is that it assumes that [the parties] both considered every conceivable situation and intended to address them all by addressing a few." U.S. Immigration & Naturalization

_____

[3] Section 7.02(a)(iv) provides, in relevant part, "any portion of any Dalkon Shield Claim that is a Claim for punitive damages is a Disallowed Claim[.]"

[4] The maxim is "only an aid to construction." Continental Illinois National Bank & Trust Co. of Chicago v. Chicago, R.I. & P. Railway Co., 294 U.S. 648, 678 (1935). It is "`often a valuable servant, but a dangerous master[.]'" Ford v. United States, 273 U.S. 593, 612 (1927) (quoting Colquhon v. Brooks, 21 Q.B. Div. 52, 65)

5

Service v. Federal Labor Relations Authority, 4 F.3d 268, 272 (4th Cir. 1993). Moreover, the claimants ask us to infer from the exclusion of punitive damages the inclusion of all other forms or elements of recovery, i.e. exclusio unius est expressio alterius. We think that this "maxim" is even more tenuous than its opposite.

In any event, proper application of expressio unius supports the district court's decision. If one is to use that doctrine to deduce anything from the Plan's silence about prejudgment interest, then one should see what the Plan says about interest, rather than damages. Section 4.03 provides for the payment of interest on liquidated claims from January 1, 1988, until the date of payment. That is all. Thus, our venerable maxim would suggest that the Plan's silence as to any other sort of interest implies its exclusion.

To the district court, the Plan's silence was deafening:

> This Court presided over the evolution of the Plan in 1988, as well as the proceedings relating to the five failed plans that came before it. Facing thousands of claims and the gargantuan task of corralling them in one location, determining the total funds needed to process and pay them, and then designing the procedures to do so, the Court confirmed the Plan over the objections of those who decried as inadequate the $2.475 billion the Court estimated as sufficient to satisfy all valid Dalkon Shield claims. Formed in that crucible, the Court is satisfied that the Plan neither created nor guaranteed rights to payment through silence or omission. The absence of a clear entitlement in the Plan to a particular monetary benefit leads to the presumption that the writers of the Plan did not intend to bestow it upon claimants.

In re A. H. Robins Co., Inc. (Nelson), 216 B.R. at 179.

C.

A far better source of assistance in interpreting the Plan is the disclosure statement that preceded its confirmation. [5] Under 11 U.S.C.
_____
[5] According to at least one court, a confirmed plan includes "all documents which were confirmed together to form the contract," including

§ 1125(b), creditors' votes may not be solicited for or against a reorganization plan until a disclosure statement is transmitted to the creditors. The disclosure statement must contain "adequate information," i.e. sufficient information to permit a reasonable, typical creditor to make an informed judgment about the merits of the proposed plan. § 1125(a). Moreover, the court must assess the disclosure statement's adequacy and approve it before transmittal.

The disclosure statement approved by the court here could scarcely have been any clearer about interest (emphasis added):

> [P]ayments to Dalkon Shield users and their families will be made only out of the Claimants Trust. Some claimants, whose claims have already been determined, will be paid right after the Plan goes into effect. These claimants are in two groups. First, people who had a valid settlement agreement with Robins before August 21, 1985, when Robins' bankruptcy case began, will be paid the amount of their settlement right away. Second, people who had won final lawsuits against Robins before August 21, 1985, will be paid right away. If Robins appealed a case, however, and if all the appeals or other court proceedings are not over, those people will be paid as soon as their case is over, unless their judgment is overturned. Those of you with the settlements or judgments described above will also be paid interest from January 1, 1988. This interest will be at the rate set by a major bank as its "reference rate," plus one quarter of one percent. People who do not now have settlements or judgments from before August 21, 1985, will not receive interest.

Thus, the 94.38% of voting Dalkon Shield claimants who favored the Plan were surely not under the misperception that the Plan provided for interest on unliquidated claims.

---

the disclosure statement. In re Sugarhouse Realty, Inc., 192 B.R. 355, 363 (E.D. Pa. 1996). We need not go so far today. Nelson and Wiltshire seek a construction of the Plan that does not rely on the literal, certain meaning of a written provision of it. Hence, resort to extrinsic evidence (if the disclosure statement is indeed extrinsic) to explain the Plan is entirely appropriate. See generally 17A Am.Jur.2d Contracts, §§ 337, 403.

7

D.

Finally, the course of administration of the Trust lends support to the district court's decision. Over its decade of existence, the Trust has never paid prejudgment interest, and ninety-seven percent of claims have been resolved voluntarily. That a right to payment supposedly provided by the Plan has been forgone by so many for so long casts grave doubt on the right's existence.

III.

Nelson and Wiltshire contend that, even if the Plan does not compel the payment of prejudgment interest on their claims, the district court should have awarded it under general bankruptcy law.

We have already noted on several occasions that the district court is invested with a great deal of discretion in supervising the administration of the A. H. Robins Plan.[6] E.g., In re A.H. Robins Co. (Bledsoe v. Dalkon Shield Claimants Trust), 112 F.3d 160, 163 (4th Cir. 1997); In re A. H. Robins Co. (Bergstrom v. Dalkon Shield Claimants Trust), 86 F.3d 364, 376-378 (4th Cir.), cert. denied , 117 S.Ct. 483 (1996); In re A. H. Robins Co. (Anderson v. Dalkon Shield Claimants Trust), 42 F.3d 870, 875 (4th Cir. 1994). Moreover, the rudder guiding exercises of this discretion is equity, because the administrative power of the bankruptcy courts is inherently equitable.[7] In re A. H. Robins Co. (Dalkon Shield Claimants Trust v. Reiser), 972 F.2d 77, 82 (4th Cir. 1992); In re A. H. Robins Co. (Menard-Sanford v. Mabey), 880 F.2d

_____

[6] Section 8.05 of the Plan vests numerous powers in the district court, including the power "to resolve controversies and disputes regarding interpretation and implementation of the Plan, the Trust Agreements, [and] the Claims Resolution Facility[.]"

[7] Of course, the codification of the law of bankruptcy is a check on the power of the courts, and freewheeling appeals to "equity" cannot override statutory commands. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988). On the other hand, Congress expressly recognized -- and endorsed -- the full use of the courts' equitable powers to effect the provisions of the Bankruptcy Code. See 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

694, 701 (4th Cir.), <u>cert. denied</u>, 493 U.S. 959 (1989). "A purpose of bankruptcy is so to administer an estate as to bring about a ratable distribution of assets among the bankrupt's creditors." <u>Vanston Bondholders Protective Committee v. Green</u>, 329 U.S. 156, 161 (1946).

The continuing accrual of interest -- particularly postpetition interest -- is a self-evident way to upset this equitable goal. The very filing of a bankruptcy petition assures a delay in payment of debts. Because this delay is both necessary and compelled by law "for the joint benefit of debtor, creditors, and the public," <u>id.</u> at 166-167, the accrual of interest generally ends with the filing of the petition. <u>Id.</u> at 163; 11 U.S.C. § 502(b)(2).

Exceptions to this general rule are themselves equity driven. A pre-Code[8] rule permitted the award of postpetition interest where the estate proved solvent. <u>See United States v. Ron Pair Enterprises</u>, 489 U.S. 235, 246 (1989) (dicta).[9] This rule is now codified for Chapter 7 cases at 11 U.S.C. § 726(a)(5). Another permits an oversecured creditor (i.e. one whose claim is of less value than the secured property) to collect postpetition interest to the extent of the oversecurity. 11 U.S.C. § 506(b); <u>Ford Motor Credit Co. v. Dobbins</u>, 35 F.3d 860 (4th Cir. 1994).

Though prepetition interest is more often awarded, it too can be disallowed in the interest of fairness to all. <u>Smith v. Robinson</u>, 343 F.2d 793, 800 (4th Cir. 1965). "'In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate.'" <u>Id.</u> at 801 (quoting <u>Pepper v. Litton</u>, 308 U.S. 295, 307-308 (1939)).

The district court gave cogent reasons for its decision that allowing prejudgment interest, whether pre- or postpetition, to holders of unliquidated claims would be inequitable. 216 B.R. at 184-187. The court

_____

**8** We borrow this term from the <u>Ron Pair</u> Court as a shorthand way to refer to the law as it existed before the comprehensive Bankruptcy Reform Act of 1978, Pub. L. 95-598, 92 Stat. 2549 (1978).
**9** Because not a cent of the Trust's residue will revert to Robins, we reject the claimants' reliance on this exception.

9

began with the general disfavor of postpetition interest expressed by the Supreme Court in <u>Vanston Bondholders</u>. Next, it pointed out that the central goal of the Robins Plan, and of bankruptcy law in general, is equality of treatment among creditors. <u>See In re A.H. Robins (Reiser)</u>, 972 F.2d at 82 ("core purpose of the [Dalkon Shield Claimants] Trust" is "to uniformly compensate" the injured). Many states do not generally allow prejudgment interest,[10] and those that do employ diverse rates and methods of computation. Accrual dates could differ according to local law; identical claims could go to trial months or years apart. Hence, prejudgment interest could quickly render uniformity the exception rather than the rule.

Finally, the district court cited the great financial success of the Trust. Under CRF § G.14, this success will eventually inure to the benefit of claimants like Nelson and Wiltshire:

> To the extent funds ... remain after all ... claims are paid in full, the remaining funds shall be paid in lieu of punitive damages to all claimants (other than holders of Dalkon Shield Liquidated Claims) who received compensatory damage awards from the Trust, on a pro rata basis consistent with such awards.

The Trust currently estimates that eligible claimants will receive a 100% ratable share, i.e. a double recovery. Moreover, the ineligible claimants are those with prepetition liquidated claims, who, not coincidentally, received interest on their awards under the Plan.

That all of this is equitable and a sound exercise of the district court's broad discretion should be manifest.

The judgment of the district court is affirmed.

<u>AFFIRMED</u>

---

**10** The parties report that 31 states ordinarily award prejudgment interest. Inasmuch as there is no dispute on this point, we have not undertaken our own survey of state law.